ETHYL CORPORATION, Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, et al., Respondents.

American Automobile Manufacturers
Association, Ferroalloys Association,
Intervenors.

No. 94–1505.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 13, 1995.

Decided April 14, 1995.

F. William Brownell argued the cause, for petitioner. With him on the briefs was Kevin L. Fast.

Jon. M. Lipschultz, Atty., Dept. of Justice, argued the cause, for respondents. With him on the brief were Lois·J. Schiffer, Asst. Atty. Gen., Dept. of Justice, and Timothy D. Backstrom, Atty., E.P.A.

V. Mark Slywynsky argued the cause and filed the brief, for intervenor American Auto. Mfrs. Ass'n.

Mark Brian Benedict filed the brief, for intervenor Ferroalloys Ass'n.

Before EDWARDS, Chief Judge, WALD and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

HARRY T. EDWARDS, Chief Judge:

At issue in this case is a claim that the Administrator of the Environmental Protection Agency ("EPA" or "Agency") has impermissibly construed a provision of the Clean Air Act ("Act") governing the regulation of fuel additives. Title II of the Act, 42 U.S.C. §§ 7521–7590 (1988 & Supp. V 1993), establishes a comprehensive scheme for regulating motor vehicle emission and fuel standards for the prevention and control of air pollution.[1] Section 211(f)(1) prohibits the introduction into commerce of new fuels or fuel additives which are not "substantially similar" to existing fuels and fuel additives. *Id.* § 7545(f)(1). A manufacturer may, however, under section 211(f)(4), apply to the Administrator of the EPA for a waiver of the section 211(f) prohibition if the manufacturer can show that the fuel additive "will not cause or contribute to a failure of any emission control device or system ... to achieve compliance by the vehicle with the emission standards." *Id.* § 7545(f)(4). In this case, Ethyl Corporation ("Ethyl") attempted to secure a waiver for a fuel additive under section 211(f)(4), and the Administrator denied the waiver request for reasons other than those specified in the applicable statutory provision.

Beginning in 1990, Ethyl filed its first of four section 211(f)(4) waiver applications with the Agency for a fuel additive, methylcyclopentadienyl manganese tricarbonyl ("MMT"), designed to prevent auto-engine knocking. The Agency denied the first three applications on the grounds that Ethyl failed to satisfy the emissions criterion; the manufacturer had not shown that MMT "will not cause or contribute to a failure of any emission control devise or system ... to achieve compliance ... with the emission standards." *Id.* § 7545(f)(4). In response to Ethyl's fourth application, which is the subject of this litigation, the Administrator decided that Ethyl's tests satisfied the emissions criteria. *Fuels & Fuel Additives; Waiver Decision/Circuit Court Remand,* 59 Fed.Reg. 42,227, 42,259 (1994) ("*Waiver Decision*"). However, rather than granting the waiver, the Administrator decided that she had discretion under the Act to "consider other factors in determining whether granting a waiver is in the public interest and consistent with the objectives of the Clean Air Act," including the effects of MMT on public health. *Id.* The Administrator then determined that Ethyl had failed to satisfy the Agency's public health concerns, concluding

---

1. Parts A and C, which compose the vast majority of title II, establish motor vehicle emission and fuel standards, *see id.* §§ 7521–7551, 7581–7590; part B establishes aircraft emission standards, *see id.* §§ 7571–7574.

that there was a "reasonable basis for concern about the effects on public health that could result if EPA were to approve use of MMT in unleaded gasoline." *Id.* at 42,260. On that basis, the Administrator denied Ethyl's application for a waiver. *Id.* at 42,261. Ethyl petitioned this court for review of the Administrator's decision and we now grant its petition.

We hold that the Administrator violated the clear terms of section 211(f)(4) in denying Ethyl a waiver for MMT on public health grounds. The language of section 211(f)(4) is clear, directing the Administrator to consider only emission effects, not public health effects, in waiver determinations. Because Congress instructed the EPA to evaluate only the effect on emissions in waiver determinations, and because Ethyl has met the statutory criteria, we hold that the Administrator of the EPA exceeded her authority in denying Ethyl's request for a waiver for MMT. Accordingly, we vacate the Agency's *Waiver Decision* and order the EPA to grant Ethyl a waiver for its fuel additive.

## I. BACKGROUND

### A. *The Statutory and Regulatory Regime*

In enacting section 211 of the Clean Air Act, 42 U.S.C. § 7545, Congress adopted a preventative approach to the regulation of fuels, banning fuels and fuel additives which were not "substantially similar" to existing products.[2] *See id.* § 7545(f)(1). Section 211(a) authorizes the Administrator to prohibit the sale of fuels and fuel additives unless they have been registered with the Administrator under section 211(b). *See id.* § 7545(a), (b). Before registering a fuel additive under section 211(b), the Administrator may require the manufacturer "to conduct tests to determine potential public health effects of such fuel or additive" and to furnish information regarding the fuel additive's effect on "the emission control performance of any vehicle ... or the extent to which such emissions affect the public health or welfare." *Id.* § 7545(b)(2)(A), (B). Under

section 211(c), the Administrator may "control or prohibit" the manufacture or sale of any fuel additive, if she determines that "any emission product of such ... fuel additive causes, or contributes, to air pollution which may reasonably be anticipated to endanger the public health or welfare" or "impair to a significant degree the performance of any emission control device or system which is in general use." *Id.* § 7545(c)(1)(A), (B).

Section 211(f)(1) prohibits the introduction into commerce of new fuel additives, stating that "it shall be unlawful for any manufacturer of any fuel or fuel additive to first introduce into commerce" a fuel additive for general use "which is not substantially similar" to those additives already in use. *Id.* § 7545(f)(1)(A). Under that section, however, the Administrator may grant a waiver if the manufacturer demonstrates that the fuel additive will not cause or contribute to a failure of any emission system which ensures compliance with the emission standards. *See id.* § 7545(f)(4).[3] That provision states:

> The Administrator, upon application of any manufacturer of any fuel or fuel additive, may waive the prohibitions established under paragraph (1) or (3) of this subsection or the limitation specified in paragraph (2) of this subsection, if he determines that the applicant has established that such fuel or fuel additive or a specified concentration thereof, and the emission products of such fuel or additive or specified concentration thereof, will not cause or contribute to a failure of any emission control device or system (over the useful life of any vehicle in which such device or system is used) to achieve compliance by the vehicle with the emission standards with respect to which it has been certified pursuant to section 7525 of this title.

*Id.* The provision gives the Administrator 180 days from the receipt of such application to act before "the waiver ... shall be treated as granted." *Id.*

---

2. The provisions of section 211 refer to both fuels and fuel additives. Because this case involves a fuel additive, we refer to the provisions' dictates as they relate to fuel additives.

3. Congress added section 211(f) to the Clean Air Act in 1977. *See* Clean Air Act Amendments of 1977, Pub.L. No. 95–95, § 222, 91 Stat. 685, 763–64 (1977).

In 1978, the EPA issued guidelines describing the specific requirements for a waiver under section 211(f)(4). *Guidelines for Fuel Additive Waivers*, 43 Fed.Reg. 11,258 (1978); *Guidelines for Section 211(f) Waivers for Alcohol–Gasoline Blends*, 43 Fed.Reg. 24,131 (1978). Those guidelines explain that "[a] request for a waiver should contain data relating to a fuel additive's emissions effects which are derived from vehicle testing," and describe the testing procedures indicative of effects on emissions. 43 Fed.Reg. at 11,259. The guidelines do not mention a public health criterion or any testing procedures for determining public health effects. Before the waiver decision at issue in this case, the Agency had considered twenty-three applications for waivers under section 211(f)(4), and it never previously relied on public health effects in denying a waiver. *See Waiver Decision* at 42,232, 42, 234.

### B. *The Waiver Proceedings*

The fuel additive, methylcyclopentadienyl manganese tricarbonyl or MMT, commercially labeled by Ethyl as HiTEC 3000, is to be blended in unleaded gasoline.[4] MMT increases octane when it is added to gasoline to prevent auto-engine knocking. Because Ethyl's additive is less expensive than other octane enhancers, EPA assumed that if a waiver was granted, MMT would likely be used in a large proportion of this country's gasoline. *See Fuels & Fuel Additives; Waiver Application*, 57 Fed.Reg. 2535, 2536, 2547 n. 58 (1992) ("*1992 Waiver Decision*"). In the past, MMT was used in leaded gasoline in the United States and in unleaded gasoline in Canada. *Id.* at 2536. MMT's principal component is manganese, which has been the subject of a number of health-related studies, the results of which reveal a debate in the scientific community regarding its potential health hazards. *See Waiver Decision* at 42,239–55.

Before the proceedings culminating in this action, Ethyl sought and had been denied waivers for MMT use in unleaded fuel on several occasions. Ethyl submitted its first waiver application on March 17, 1978. In denying the waiver application, EPA found that the use of MMT causes or contributes to the failure of vehicles to meet emissions standards. *In re Applications for MMT Waiver*, 43 Fed.Reg. 41,424, 41,424–25 (1978). Specifically, the EPA determined that, at the concentration level proposed by Ethyl, MMT had "a statistically significant adverse HC [hydrocarbon] emissions effect." *Id.* at 41,427. On May 26, 1981, Ethyl submitted its second waiver application. Once again, the Administrator denied the application, finding that Ethyl failed to demonstrate that the requested level of MMT in unleaded gasoline would not cause or contribute to the failure of vehicles to comply with emission standards. *Ethyl Corp.; Denial of Application for Fuel Waiver; Summary of Decision*, 46 Fed.Reg. 58,360, 58,360 (1981). In 1988, Ethyl began a series of discussions with EPA staff to formulate a program to develop the necessary data for a waiver.

On May 9, 1990, Ethyl submitted its third application for use of MMT in unleaded gasoline. Near the end of the 180–day period for a decision, the EPA encouraged Ethyl to withdraw its application in order to address two concerns. First, the EPA had generated some data at an Ann Arbor, Michigan test facility that contradicted Ethyl's data; Ethyl subsequently demonstrated that contaminated fuel caused the Ann Arbor test results. Second, the EPA was interested in the possible health implications of manganese emissions associated with MMT. On November 1, 1990, Ethyl withdrew its application, and on July 12, 1991, Ethyl reapplied for a waiver. In support of its application, in EPA's words, Ethyl provided "the most extensive test program ever conducted by a waiver applicant." *1992 Waiver Decision* at 2538. However, the Administrator denied Ethyl's application again on the ground that Ethyl failed to establish that MMT will not cause or contribute to the failure of a significant number of vehicles to achieve emissions standards. *Id.* at 2541. In support of its decision, the EPA cited data presented by Ford Motor Company ("Ford") showing that "MMT-induced HC [hydrocarbon] emissions

---

**4.** Ethyl proposes blending MMT in unleaded gasoline at a level no greater than 0.03125 (1/32) gram per gallon manganese (gpg Mn). *See Waiver Decision* at 42,228.

increases are potentially far greater than those reported by Ethyl." *Id.* at 2543. While the Administrator mentioned some concerns about the adverse public health effects of an increase in airborne manganese (as well as possible atmospheric problems associated with MMT), the Agency "chose[ ] not to base its decision, in whole or part, on this issue." *Id.* at 2547.

In February of that year, Ethyl filed a petition for review of the Administrator's *1992 Waiver Decision* with this court, but subsequently entered into settlement discussions with EPA. Ethyl provided EPA with new test data, refuting Ford's data, and thereby undermining the Administrator's *1992 Waiver Decision.* In response, EPA sought a voluntary remand of Ethyl's pending petition, which this court granted in *Ethyl Corp. v. Browner,* 989 F.2d 522, 524 (D.C.Cir.1993).[5] In November of 1993, toward the end of the remand's 180–day period, Ethyl and EPA entered into discussions about extending the deadline; Ethyl then agreed to withdraw and immediately resubmit its waiver application on November 30, 1993, beginning another 180–day period, to end on May 29, 1994. *Fuels & Fuel Additives; Extension of Time & Finding Concerning Fuel Additive Waiver Application,* 58 Fed.Reg. 64,761, 64,763 (1993). For purposes of the resubmitted application, EPA determined that Ethyl had demonstrated that use of MMT at the specified concentration will not cause or contribute to a failure of any emission control device or system to achieve compliance with the emissions standards pursuant to section 211(f)(4).[6] *Id.* at 64,764–65.

In May of 1994, Ethyl and EPA agreed once again to extend the deadline for final agency action to July 13, 1994, and on that day, EPA issued the waiver decision which is the subject of this case. *See Waiver Decision* at 42,231. The Administrator "inter-

pret[ed] section 211(f)(4) of the Act as establishing a two-stage process for evaluating waiver applications." *Id.* at 42,259. First, according to the Administrator, a determination must be made "whether an applicant has met its burden of demonstrating that a fuel [additive] does not cause or contribute to a failure to meet regulated emission standards." *Id.* In the "second stage," the Administrator claimed that she had the discretion to "consider other factors [such as the potential health effects resulting from use of a fuel additive] in determining whether granting a waiver is in the public interest and consistent with the objectives of the Clean Air Act." *Id.* The Administrator noted that she had determined in November of 1993 that Ethyl satisfied the first criterion; *i.e.,* that "use of Ethyl's product HiTEC 3000 in unleaded gasoline at the specified concentration will not cause or contribute to a failure to achieve compliance with vehicle emission standards." *Id.* As to "other factors," however, the Administrator found that "there is a reasonable basis for concern about the effects on public·health that could result if EPA were to approve use of MMT in unleaded gasoline." *Id.* at 42,260. Thus, the Administrator again denied Ethyl's request for a waiver of section 211(f)'s prohibition of new fuel additives.

## II. ANALYSIS

The principal dispute in this case involves EPA's interpretation of section 211(f)(4) of the Act. Ethyl contends that EPA has acted contrary to law in denying Ethyl's application for a waiver under section 211(f)(4) on public health grounds. Ethyl argues that the waiver provision contemplates only emissions criteria. EPA, on the other hand, contends that Congress has not directly spoken on the issue of whether the Administrator may consider the public health implications of fuel additives before granting or denying a section 211(f)(4) waiver. Thus, it argues, this

---

5. Although the court's decision was issued on April 6, 1993, the mandate implementing the judgment was not transmitted to the Agency until June 3, 1993, which began another 180–day period. *Fuels & Fuel Additives; Extension of Time & Finding Concerning Fuel Additive Waiver Application,* 58 Fed.Reg. 64,761, 64,761 (1993).

6. The Agency qualified its side of the bargain, noting that its determination would not preclude subsequent regulatory actions concerning emission effects under section 211(c) or other provisions, nor would its determination apply to new waiver applications were EPA to deny Ethyl's application. *Id.* at 64,764–65.

court must defer to the Agency's reasonable interpretation of section 211(f)(4) as providing the Administrator with discretionary authority to consider factors "in the public interest" and in accordance with the "objectives of the Clean Air Act" in waiver determinations.

## A. Public Health Determination under Section 211(f)(4)

In reviewing an agency's construction of the statute which it administers, a court first looks to whether Congress has spoken to the precise question at issue: if Congress's intent can be ascertained from the plain language of the statute, then that intent must be given effect. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). In this case, given the plain language of section 211(f)(4), we are obliged to give effect to "the unambiguously expressed intent of Congress." *Id.*

■ Section 211(f)(4) instructs the Administrator to consider a new fuel additive's effects only on emission standards. The language of the provision, allowing for a waiver of the prohibition if the manufacturer can show that its additive "will not cause or contribute to a failure of any emission control device or system . . . to achieve compliance . . . with the emission standards," 42 U.S.C. § 7545(f)(4), is specific and definite; it does not permit the Administrator to consider other factors "in the public interest." When compared to the language in section 211(c)(1), which authorizes the Administrator to control or prohibit fuel additives if the emission product contributes "to air pollution which may reasonably be anticipated to endanger the public health," *id.* § 7545(c)(1)(A), it is all the more apparent that Congress's definite scheme does not afford the kind of discretion the EPA would find. Finally, the legislative history of section 211(f) also indicates that Congress was concerned with MMT's effects on emissions, not on public health. Given the plain meaning of the statute, we hold that the EPA erred in considering the health effects of MMT in deciding whether to grant Ethyl a waiver for its fuel additive.

### 1. The Language of Section 211(f)(4)

Section 211(f)(1) prohibits the introduction into commerce of new fuel additives which are not "substantially similar" to existing commercial fuel additives, and section 211(f)(4) allows the Administrator to waive that prohibition upon a finding that the fuel additive does not cause or contribute to a failure of vehicles to meet emission standards. Specifically, section 211(f)(4) allows the Administrator to waive that prohibition upon a showing that the emission products of the fuel additive

> will not cause or contribute to a failure of any emission control device or system (over the useful life of any vehicle in which such device system is used) to achieve compliance by the vehicle with the emission standards with respect to which it has been certified pursuant to section 7525 of this title.

*Id.* § 7545(f)(4). The plain language of the provision makes clear that waiver decisions are to be based on one criterion: a fuel additive's effect on emission standards. And Congress was specific as to how the Agency was to evaluate that criterion: it was to assess whether the additive's emission products "causes or contributes" to an emission control device's ability to comply with the Act's emission standards. Nowhere in this waiver provision is there any mention of applicants establishing or the Administrator determining a fuel additive's effect on public health. In basing her waiver decision on the public health implications of MMT, the Administrator acted contrary to the plain language of section 211(f)(4).

■ The EPA defends its decision to consider the public health effects in waiver determinations by arguing that the language of section 211(f)(4) shows that Congress intended to invest the Administrator with "some *significant* amount of discretionary authority." Brief for Respondents at 25. The Agency states that, "the most obvious indication of Congressional intent on the scope of her [the Administrator's] discretion is the use of the word 'may' in describing EPA's waiver

authority under section 211(f)."[7]  *Id.* at 24. But the waiver provision read in its entirety reveals that Congress's use of the word "may" does not afford the Administrator the discretionary authority she claims.

The provision states that "[t]he Administrator, upon application of any manufacturer of any fuel or fuel additive, may waive the prohibitions ... if he determines that" the emissions will not cause or contribute to a failure of emission systems to comply with the standards.  42 U.S.C. § 7545(f)(4).  The use of the word "may" in this context refers to the Administrator's discretion to either act affirmatively, granting or denying a waiver, or not to act, and instead, to let the 180–day limit run.  *See* § 7545(f)(4) ("If the Administrator has not acted to grant or deny an application under this paragraph within one hundred and eighty days of receipt of such application, the waiver authorized by this paragraph shall be treated as granted."); *see also* S. REP. No. 127, 95th Cong., 1st Sess. 91 (1977), *reprinted in* 3 LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1977, at 1371, 1465 (1978) ("1977 LEGISLATIVE HISTORY") ("The committee was mindful that the Administrator could choose not to act on the waiver application within the 180 days provided for such action.").  There is no doubt that the Agency has the authority to make the factual determination of whether an applicant has submitted enough data on emissions effects to satisfy the applicable standards, and a reviewing court must respect this role.  *See Ethyl Corp. v. EPA,* 541 F.2d 1, 36–37 (D.C.Cir.1976) (*en banc*) ("We must look at the decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality."), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).  But this does not mean that the Agency can apply criteria beyond those prescribed in the statute in enforcing the waiver provision.  Congress's use of the word "may" refers to the Administrator's decision whether to act or not within 180 days and to the Agency's general discretion in evaluating scientific data.  Congress's use of the word "may" does not, however, open the door for the Administrator to consider any factor she deems "in the public interest" before granting or denying a section 211(f)(4) waiver.

The Agency points to this court's decision in *Motor Vehicle Mfrs. Ass'n, Inc. v. EPA,* 768 F.2d 385 (D.C.Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 892 (1986), to support the EPA's broad view of its discretion in section 211(f)(4) waiver determinations.  In that case, the court "note[d] at the outset" of its opinion "that the decision whether to grant a waiver is committed to the discretion of the Administrator."  *Id.* at 390.  The court, however, was deciding issues of a very different sort; it was determining the standard by which the Administrator evaluates the statutory emissions criterion, not whether the Administrator may add new criteria not specified in the statute.  *See id.* at 389 (noting that question at issue is "[d]oes section 211(f)(4) require the EPA to determine that a fuel will not cause or contribute to *any* increase in emissions or only that it will not cause or contribute to an increase which exceeds applicable emissions standards").[8]  Thus, *Motor Vehicle Mfrs. Ass'n* plainly does not support the Agency's expansive view of its discretion to

---

7. The EPA suggests that, "[w]hile 'the context of a particular usage may at times require the construction of "may" as mandatory or "shall" as permissive,' it is generally true that 'the use of the word "shall" indicates the absence of discretion, [and] the use of "may" indicates its presence.'"  Brief for Respondents at 24 (quoting *LO Shippers Action Comm. v. ICC,* 857 F.2d 802, 806 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1089, 109 S.Ct. 2429, 104 L.Ed.2d 986 (1989).  This general statement, however, does not describe where the discretion lies when Congress provides a specific criterion by which the Administrator is to evaluate manufacturers' applications and leaves the actual determination to the Administrator.

8. The *Motor Vehicle Mfrs. Ass'n* court also addressed whether "section 211(f)(4) oblige[d] the EPA to require applicants to submit emission data on vehicles tested over a 50,000–mile period or may the EPA evaluate the long-term effects of a new fuel on the basis of reasoned technical judgments."  *Id.*  Again, this represents a narrow question concerning the standards by which the Administrator evaluates a statutory criterion.

consider other factors not mentioned in the waiver provision.

Implicit in the EPA's argument is the notion that if Congress has not mentioned public health in section 211(f)(4), then Congress is "silent or ambiguous" as to that issue, *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782; and the Agency therefore has discretion to regulate on the basis of that issue. This argument, however, misconstrues the *Chevron* analysis. In *Chevron*, the Supreme Court reasoned that " '[t]he power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' " 467 U.S. at 843, 104 S.Ct. at 2782 (quoting *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974)). In *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563 (D.C.Cir.), *cert. denied*, 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987), this court explained how this delegation of discretionary authority occurs, stating, "[w]hen Congress leaves gaps ..., either explicitly by authorizing the agency to adopt implementing regulations, or implicitly by enacting an ambiguously worded provision that the agency must interpret, it has explicitly or implicitly delegated to the agency the power to fill those gaps." *Id.* at 1569. In this case, Congress has neither explicitly or implicitly delegated discretionary authority to the Agency to consider other factors "in the public interest" in waiver determinations. Section 211(f)(4) does not direct the Agency to adopt implementing regulations nor is it ambiguously worded. Rather, the statutory waiver provision unambiguously expresses Congress's intent that the Administrator consider a fuel additive's effects on vehicles meeting emission standards.

We recently explained the reasoning behind our insistence on an explicit or implicit delegation of authority to an agency before granting it deference.

[D]eference is warranted only when Congress has left a gap for the agency to fill pursuant to an express or implied "delega-

tion of authority to the agency." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)....

To suggest, as the [agency] effectively does, that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power ..., is both flatly unfaithful to the principles of administrative law ... and refuted by precedent. *See, e.g., Natural Resources Defense Council v. Reilly*, 983 F.2d 259, 266 (D.C.Cir.1993) (" '[I]t is only legislative *intent to delegate* such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron*.' ") (quoting *Kansas City v. Department of Housing & Urban Dev.*, 923 F.2d 188, 191–92 (D.C.Cir.1991)) (emphasis added). Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well. *Oil, Chemical and Atomic Workers International Union, AFL–CIO v. NLRB*, 46 F.3d 82, 90 (D.C.Cir.1995) (quoting *Railway Labor Executives' Ass'n v. National Mediation Bd.*, 29 F.3d 655, 671 (D.C.Cir.1994) (*en banc*), *cert. denied*, —— U.S. ——, 115 S.Ct. 1392, 131 L.Ed.2d 243 (1995), *and cert. denied*, —— U.S. ——, 115 S.Ct. 1392, 131 L.Ed.2d 243 (1995). We refuse, once again, to presume a delegation of power merely because Congress has not expressly withheld such power. The level of specificity in section 211(f)(4) concerning the emission criterion effectively closes any gap the Agency seeks to find and fill with additional criteria "in the public interest." Congress was explicit in its direction: the Agency is to consider the effects of a fuel additive's emission products on the "failure of any emission control device or system ... to achieve compliance ... with the emission standards." 42 U.S.C. § 7545(f)(4). In this case, EPA has failed to give effect to the unambiguously expressed intent of Congress.[9]

9. EPA points out that the purpose of the Act is "to protect and enhance the quality of the Na-

tion's air resources so as to promote the public health and welfare and the productive capacity

## 2. *The Language of Section 211(c)(1)*

■ Another telling indication that the Administrator has misconstrued the meaning of section 211(f)(4), is the plain language of a nearby provision, section 211(c)(1), which explicitly instructs the Administrator to consider a fuel additive's effects on public health. Section 211(c)(1) authorizes the Administrator to "control or prohibit" the manufacture or sale of any fuel additive

> (A) if in the judgement of the Administrator any emission product of such fuel or fuel additive causes, or contributes, to air pollution which may reasonably be anticipated to endanger the public health or welfare, or (B) if emission products of such fuel or fuel additive will impair to a significant degree the performance of any emission control device or system which is in general use....

42 U.S.C. § 7545(c)(1). This provision not only establishes two criteria—public health implications and emission standard problems—for controlling or prohibiting the sale of fuel additives, it also establishes standards by which the Administrator evaluates those criteria. In assessing an additive's effect on public health, the Administrator must determine whether its emission products cause or contribute to air pollution which "may reasonably be anticipated to endanger" the public health; and in assessing an additive's effect on emission standards, the Administrator must determine whether its emission products "will impair to a significant degree" the emissions performance of any emission control device or system. *Id.* § 7545(c)(1)(A), (B). The language of section 211(c)(1) demonstrates that Congress crafted a very definite scheme in which the Administrator was to consider certain criteria before taking certain actions. Specifically, she considers emission effects of fuel additives before granting waivers under section 211(f)(4), and emissions effects as well as public health effects before prohibiting or controlling the manufacture or sale of fuel additives under section 211(c)(1). The language of section 211(c)(1) only underscores our conclusion that Congress did not delegate to the Agency the authority to consider other factors "in the public interest" such as public health when acting under section 211(f)(4).[10]

We reached a similar conclusion in *American Methyl Corp. v. EPA*, 749 F.2d 826 (D.C.Cir.1984), in which we considered whether the EPA could revoke waivers under section 211(f). *Id.* at 834–36. There, we noted that "[s]ection 211(f) does not state whether waivers granted under subsection (f)(4) may be reconsidered and revoked," but that Congress did provide such a mechanism in section 211(c). *Id.* at 834–35. In reaching its conclusion, the court invoked the familiar maxim of statutory construction: *expressio unius est exclusio alterius,* meaning, "mention of one thing implies exclusion of another thing." *Id.* at 835–36 (footnote omitted); *see also National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) (quoting *Botany Worsted Mills v. United States,* 278 U.S. 282, 289, 49 S.Ct. 129, 132, 73 L.Ed. 379 (1929)) ("'When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.'"). In *American Methyl,* we stated that we "see no need to imply authority under section 211(f) to reconsider waivers granted after due deliberation" in light of the mechanism established in 211(c)(1). *Id.* at 836. Likewise, we see no need to imply

---

of its population." 42 U.S.C. § 7401(b)(1). The Agency argues that it should strive to effectuate this directive and thus its consideration of public health in its *Waiver Decision* was warranted. *See General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1571 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985) (noting "[t]he EPA's rule also furthers the purpose of the Congress"). There are two problems with the Agency's argument. First, we look to the general purpose of the statute in interpreting a provision when Congress's intent is not clear from the plain language of the provision. Second, the agency may not simply disregard the

specific scheme Congress has created for the regulation of fuels in order to follow a broad purpose statement.

**10.** Congress amended section 211(c)(1) in 1990, which only supports our conclusion that had Congress intended the Administrator to consider the public health implications of fuel additives before granting waivers, it would have amended section 211(f)(4) to reflect this grant of authority. *See* Pub.L. No. 101–549, § 212(c), 104 Stat. 2399, 2488 (1990).

authority under section 211(f)(4) to consider public health when Congress explicitly directed the Administrator to consider public health in 211(c)(1) proceedings.

### 3. *The Legislative History of Section 211(f)*

The EPA argues that consideration of the public health implications of MMT in the waiver determination is consistent with the legislative history of the Act because Congress intended and designed "a *preventative* approach to potential problems posed by MMT and other fuel additives." . Brief for Respondents at 28. To support this argument, EPA quotes from Senator Muskie—who stated that "this action was absolutely essential. . . . [given] the alarming degrees to which MMT, and potentially hundreds of other additives, threaten our entire air pollution control program," 123 CONG.REC. 18,037 (1977), *reprinted in* 1977 LEGISLATIVE HISTO-RY at 759 [11]—as well as the House Report—which states that "[t]he MMT problem shows the fallacy of waiting until an additive is already in widespread use and a problem has already developed; the preventive approach . . . is essential for the purpose of this section," H.R.REP. No. 294, 95th Cong., 1st Sess. 308 (1977), *reprinted in* 1977 LEGISLATIVE HISTORY 2465, 2775, U.S.Code Cong. & Admin.News 1977, pp. 1077, 1387. However, Congress's general intent to instill a preventative approach to air pollution regulation says little about the specific regulatory scheme it designed to implement its goals. The fact that a manufacturer must register its fuel additive with the Administrator under sections 211(a) and (b); that the Administrator may control or prohibit the sale of fuel additives under section 211(c); that Congress required testing of fuel additives under section 211(e); and that Congress enacted a general prohibition of new fuel additives under section 211(f), all support the view that

Congress enacted a preventative approach to fuel additive regulation in section 211. *See* 42 U.S.C. § 7545(a)–(f). But the recognition of a general preventative approach does not describe the criteria by which the Administrator is meant to implement this scheme of provisions.

A careful look at the legislative history to which EPA refers suggests that Congress was concerned with *preventing* MMT's effects on *emissions* and various vehicle functions, not public health. In discussing MMT, the report states:

> Although it is an open question whether conclusive proof has been forthcoming to date, there are strong indications that MMT—which is presently contained in about 40 percent of the nation's unleaded gasoline supply—fouls spark plugs, plugs up catalytic converters, increases hydrocarbon emissions, and results in rapid deterioration of catalyst efficiency.

1977 LEGISLATIVE HISTORY at 2775; *see also* note 11 *supra*. This court reiterated the congressional concern with MMT's effects on emissions in *Motor Vehicle Mfrs. Ass'n,* noting that "[t]he Senate Committee in 1977 received testimony that a certain fuel additive, MMT, 'was impairing the performance of emission control systems and increasing hydrocarbon emissions in test vehicles.' " 768 F.2d at 390 n. 7 (quoting S.REP. No. 127, 95th Cong., 1st Sess. 90 (1977)). To the extent that it is discernable from the legislative history of the Act, the thrust of Congress's concern with MMT is a concern about its effects on emissions.

While one finds numerous comments regarding public health in the legislative history surrounding the 1977 amendments to section 211, Congress did not specifically link such comments to the waiver provision. The EPA concedes this point. Brief for Respondents at 29. Congress did, however, link the

---

11. EPA has quoted selectively from Senator Muskie's statement. The Senator stated, "[t]his action was absolutely essential. Ford Motor Co. recently testified . . . that the addition of MMT to fuel will cause a significant increase in hydrocarbon emissions" which would preclude Ford from certifying some cars in California. *Id.* at 759. Senator Muskie then stated, "I think that this one example illustrates the alarming degrees to

which MMT, and potentially hundreds of other additives, threaten our entire air pollution control program. Tests by Ford indicate that a three-way catalyst test fleet using gasoline with MMT had hydrocarbon emissions of double the 0.41 standard in less than 20,000 miles." *Id.* The thrust of Senator Muskie's concern was clearly MMT's effects on emissions.

consideration of public health to other provisions, stating "[t]he committee expects the Administrator to require manufacturers to test registered additives insofar as they affect health and public welfare under subsections (a), (b) and (c) of this section." 1977 LEGISLATIVE HISTORY at 1465–66. The EPA's characterization of the legislative history does not support the Agency's expansive view of its discretion under section 211(f)(4). Rather, the legislative history of section 211(f) suggests that Congress intended the Administrator to consider a fuel additive's effects only on emission standards in section 211(f)(4) waiver determinations. At best, the legislative history is cryptic, and this surely is not enough to overcome the plain meaning of the statute.

### 4. Summary

■ We find that the language of section 211(f)(4), standing alone, and standing in contrast to section 211(c)(1), is dispositive of this case. The legislative history, to the extent that it sheds light, only supports our conclusions. Nevertheless, it is also telling that EPA has never before this case considered public health in denying a section 211(f)(4) waiver application, and that in considering public health in this proceeding, the EPA used a different standard than it uses in section 211(c)(1)(A) proceedings.

In striking down the EPA's attempt to construe a revocation authority in section 211(f), this court stated, "[o]ur unwillingness to wrest a standardless and open-ended revocation authority from a silent statute is strengthened by examination of EPA's own commitment to revocation authority—a commitment that has been qualified and tepid at best." *American Methyl*, 749 F.2d at 837. The court noted that "the agency's prelitigation administrative practice belies its professed belief in an implied revocation authority," and pointed out that "[i]n seven years of administering section 211(f), American Methyl is the first manufacturer subjected to a revocation proceeding." *Id.* at 838. Similarly, before Ethyl's application for a waiver, in twenty-three waiver proceedings, the Administrator has never denied a waiver on public

health grounds. *See Waiver Decision* at 42,-232, 42,234.

Not only is there no enforcement practice to support the Administrator's action in this case, the standard employed is not the standard the EPA has previously applied in its public health determinations under section 211(c)(1)(A). In *Ethyl Corp. v. EPA,* this court reviewed the Administrator's interpretation of the standard required in evaluating the public health implications of lead emissions under section 211(c) and found it reasonable. 541 F.2d at 12. The Administrator had construed section 211(c)(1)(A)'s "will endanger the public health" language to require a finding that the fuel additive "present[s] a significant risk of harm," and this court affirmed that construction after analyzing the language of that provision, the language of nearby provisions, and other circuits' interpretations of the Clean Air Act. *See id.* at 12–32. The court concluded that "the Administrator may regulate lead additives under Section 211(c)(1)(A) when he determines ... that lead automobile emissions significantly increase the total human exposure to lead so as to cause a significant risk of harm to the public health." *Id.* at 31–32. In this case, however, the Administrator used a very different standard from the one she uses in section 211(c)(1)(A) proceedings, saying simply that "I have concluded that there is a reasonable basis for concern about the effects on public health that could result if EPA were to approve use of MMT in unleaded gasoline pursuant to Ethyl's application." *Waiver Decision* at 42,260. This is a bizarre departure from existing practice, in complete defiance of the plain terms of the statutory criterion and with no explanation whatsoever for the application of a different standard.

In sum, the Administrator of the EPA clearly misconstrued the criterion by which she grants and denies waivers for fuel additives. The language of section 211(f)(4) is clear and specific; the Administrator is to consider MMT's effects on the ability of "any emission control devise or system ... to achieve compliance by the vehicle with the emission standards." 42 U.S.C. § 7545(f)(4). Should the Administrator wish to consider whether the emission products of MMT "may

reasonably be anticipated to endanger the public health," *id.* § 7545(c)(1)(A), she may initiate proceedings under section 211(c)(1). The Administrator plainly oversteps her authority when she considers other factors "in the public interest" such as the public health implications of an additive in section 211(f)(4) waiver proceedings.

## B. *Emissions Determination under Section 211(f)(4)*

Intervenor American Automobile Manufacturers Association ("AAMA") challenges the Administrator's determination that Ethyl's application demonstrated that MMT would not "cause or contribute to a failure of any emission control device or system ... to achieve compliance by the vehicle with the emission standards." AAMA contends first, that the Administrator erred in accepting data as to whether a significant level of emissions failures will occur instead of whether "any emission" failure will occur, as required by the statute. Second, AAMA contends that some data submitted by its members established that MMT caused the failure of vehicle onboard diagnostic ("OBD") systems. AAMA concludes that because Ethyl failed to satisfy the statutory waiver criterion, this court should deny Ethyl's request to set aside the EPA's denial of a waiver for MMT.

In reviewing EPA's construction and implementation of the terms of section 211(f)(4), this court will reverse the Agency's action only if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 42 U.S.C. § 7607(d)(9)(C) (1988), "or if it is arbitrary, capricious, or an abuse of discretion," Administrative Procedure Act, 5 U.S.C. § 706 (1988). In *Motor Vehicle Mfrs. Ass'n,* we found it unnecessary

to decide which statute governs our review since the standard we apply is essentially the same under either Act. 768 F.2d at 389 n. 6; *see also, Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 519 (D.C.Cir.1983) (standard for judicial review of EPA action under Clean Air Act taken directly from Administrative Procedure Act). If EPA acted within its delegated statutory authority, considered all of the relevant factors, and demonstrated a reasonable connection between the facts on the record and its decision, we will uphold its determination. *See Small Refiner,* 705 F.2d at 520.

█ In determining that Ethyl met the emissions criterion, the Administrator noted that the applicant bears "the burden of establishing that its fuel will not cause or contribute to the failure of any vehicle to meet emission standards;" however, "[i]f interpreted literally ... this burden of proof imposed by the Act would be virtually impossible for an applicant to meet, as it requires the proof of a negative proposition: that no vehicle will fail to meet emission standards to which it has been certified." *Waiver Decision* at 42,232. The Administrator recognized that "Congress contemplated a workable waiver provision," and, thus, the Agency allowed "reliable statistical sampling and fleet testing protocols" to be used to demonstrate that the additive will not cause emissions failures. *Id.* at 42,232–33. The Agency analyzes emission effects "using statistical tests to determine if the fuel additive will cause a 'significant' number of vehicles to fail emissions tests." *Id.* at 42,233. The EPA concluded "that Ethyl's additive passes the most critical of the historical tests with a comfortable margin."[12] *Id.* at 42,237. The Administrator also examined "Ethyl's data on the use of the additive with newer tech-

12. The Administrator noted two potential problems with the standards by which the EPA evaluates emissions effects. First, the Administrator explained that "the tests used to date by the Agency primarily consider only the 'cause' language in the statute and do not consider the portion of the statute which requires that the applicant must also show that the fuel or additive will not 'contribute' to the non-compliance of vehicles with emission standards." *Id.* at 42,-233. The Administrator noted that "[t]he Agency expects to initiate a rulemaking in the near future which will propose more appropriate criteria and statistical methodologies for reviewing

waiver applications and will afford formal notice to future applicants." *Id.* at 42,233–34. Second, the Administrator acknowledged that she "considers its existing tests and the criteria that they implement to be obsolete under current conditions." *Id.* at 42,237. The Administrator made clear that future applications "will be evaluated according to the statistical methods and criteria for evaluation of waiver applications in effect at that time." *Id.* at 42,238. As we noted in *Ethyl Corp.,* "[w]here existing methodology or research in a new area of regulation is deficient, the agency necessarily enjoys broad discretion to attempt to formulate a solution to the best of its

nology vehicles under more stringent criteria," requiring that "the additive cause no statistically significant increase in emissions," and found that the EPA could not "discern any 'real' emissions increase at all—that is, no increase that [it could] not reasonably attribute to sampling error." *Id.* at 42,238. The Administrator's analysis of the data submitted by Ethyl was careful and searching; AAMA did not come close to proving that the Administrator's analysis of the data was arbitrary and capricious.[13]

AAMA also contends that its members submitted data establishing "both a theoretical basis for, and an actual production vehicle data confirming, the failure of OBD systems"[14] caused by MMT. Brief of Intervenor AAMA at 14. After refuting three auto manufacturers' concerns about the effect of MMT on OBD systems, the Administrator turned to Ford's most recent data, submitted to the Agency on May 3, 1994, approximately two months before the Administrator's *Waiver Decision,* but after the Administrator's emissions determination. The EPA explained that it was "currently reviewing" the recent submission and that "[i]f after further investigation EPA concludes that the concerns expressed by the vehicle manufacturers are warranted, EPA intends to initiate an appropriate rulemaking under section 211(c)." *Waiver Decision* at 42,239. The Administrator provided an appropriate response to these data submitted at the last minute; and section 211(c)(1)(B) plainly contemplates administrative action based on emissions effects. *See SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1581, 91 L.Ed. 1995 (1947) (finding choice between proceeding by general rule or by *ad hoc* decisions lies in agency's discretion).

### III.  Conclusion

We hold that the Administrator misconstrued section 211(f)(4) in denying Ethyl's

application for a waiver on public health grounds. The statutory provision contemplates one criterion on which the Administrator may grant or deny a waiver to the general prohibition on new fuel additives: whether a fuel additive will "cause or contribute to a failure of any emission control device or system ... to achieve compliance by the vehicle with the emission standards." 42 U.S.C. § 7545(f)(4). The Administrator determined that HiTEC 3000 (or MMT) met the emissions criteria. Accordingly, we grant Ethyl's petition for review and instruct the EPA to grant Ethyl's request for a waiver. Our decision that the Administrator erred in refusing to grant Ethyl a waiver after finding that it had satisfied the only statutory criteria in section 211(f)(4) does not have any bearing on the Administrator's authority to initiate appropriate proceedings under section 211(c) to satisfy any Agency concerns relating to matters of public health.

*So ordered.*

---

ability on the basis of available information." 541 F.2d at 27 (quoting *Industrial Union Dep't, AFL–CIO v. Hodgson,* 499 F.2d 467, 474 n. 18 (D.C.Cir.1974) (citing *Permian Basin Area Rate Cases,* 390 U.S. 747, 811, 88 S.Ct. 1344, 1383, 20 L.Ed.2d 312 (1968))).

**13.** In fact, AAMA admits that "a literal interpretation of the provisions of § 211(f)(4) could be construed 'as requiring the testing of every vehi-

cle,' and this could not be what Congress contemplated." Brief of Intervenor AAMA at 12.

**14.** "An Onboard Diagnostic System ... monitors the activity of an automobile's emission control system, primarily the catalytic converter, and alerts the driver via a dashboard light in the event of a malfunction." *Waiver Decision* at 42,238 n. 48.