ETHYL CORPORATION, Petitioner,

v.

Carol M. BROWNER, Administrator of the United States Environmental Protection Agency, and the United States Environmental Protection Agency, Respondents,

American Automobile Manufacturers Association, Intervenor.

No. 94–1516.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1995.

Decided Oct. 20, 1995.

F. William Brownell, with whom Kevin L. Fast, Washington, DC, was on the brief, argued the cause for petitioner.

Timothy D. Backstrom, Attorney, Environmental Protection Agency, with whom Lois J. Schiffer, Assistant Attorney General, and Jon M. Lipshultz, Attorney, U.S. Department of Justice, Washington, DC, were on the brief, argued the cause for respondents.

Samuel I. Gutter, Washington, DC, with whom V. Mark Slywynsky, Detroit, MI, was on the brief, argued the cause for intervenor.

Before: WILLIAMS, SENTELLE and RANDOLPH, Circuit Judges.

STEPHEN F. WILLIAMS, Circuit Judge:

For the second time in less than a year we address the legality of decisions by the Environmental Protection Agency blocking Ethyl Corporation's distribution of a fuel additive, "MMT," also known as "HiTEC 3000." Because of a ban deriving from § 211(f)(1) of the Clean Air Act, 42 U.S.C. § 7545(f)(1), Ethyl has long been unable to sell MMT for use as a bulk additive in unleaded gasoline without a waiver from the Environmental Protection Agency under § 211(f)(4), 42 U.S.C. § 7545(f)(4). On November 30, 1993 the EPA found that MMT had no adverse effects on automobiles' emissions control systems, but simultaneously withheld the f(4) waiver in order to look into MMT's possible public health effects. 58 Fed.Reg. 64761, 64764–45 (1993). In *Ethyl Corp. v. EPA,* 51 F.3d 1053 (D.C.Cir.1995) ("*Ethyl I*"), we held that § 211(f)(4) allowed EPA to consider

only emission control effects; once the EPA found MMT innocent of any adverse effect on those systems, it was legally required to grant the waiver, and we ordered it to do so.

Lawful sale of MMT, however, requires not only the f(4) waiver but also that the additive be registered under § 211(b) of the Clean Air Act, 42 U.S.C. § 7545(b). Ethyl claims that MMT has in fact been registered for sale for use in unleaded gasoline since 1970, while EPA asserts that in the period when an f(4) waiver was required for lawful sale, but no waiver had been issued, MMT could not have been registered for such sales. The fight may seem trivial; now that MMT has been held entitled to the waiver, EPA's sole ground for claiming non-registration has disappeared, so, one might expect, registration would flow ineluctably. But EPA's contention has an important collateral consequence. Under § 211(e)(2), 42 U.S.C. § 7545(e)(2), an additive that is already registered on the date that EPA promulgates regulations for certain testing remains registered (subject to possible loss of registration if the test results are bad), while an additive *not* registered on that date must satisfy the testing requirements *before* being registered. On May 27, 1994 EPA adopted fuel additive testing regulations.[1] See Fuels and Fuel Additives Registration Regulations, 59 Fed. Reg. 33042 (1994). Since EPA had not granted the waiver on that date (or indeed until after our decision in *Ethyl I,* see 60 Fed.Reg. 36414/1 (July 17, 1995) (effective date July 11, 1995)), MMT could not, on EPA's theory, secure registration until it overcame this new testing hurdle—a matter surely of years, perhaps of decades.

We find it unnecessary, however, to sort out the parties' claims as to whether MMT's registration ever ceased to embrace its sale for use in unleaded gasoline. Because EPA should have granted the f(4) waiver on November 30, 1993, when it published its finding that Ethyl had met the only legal requirement for obtaining the waiver, we will treat the waiver as having been granted as of

that date, nunc pro tunc. As EPA has consistently indicated that there has been no other obstacle to registration, it follows that MMT, assuming it ever lost its registration for use in unleaded gasoline, would have regained it on or about November 30, 1993, well before promulgation of the 1994 testing regulations. Accordingly, we order EPA to register MMT for use as an additive in unleaded gasoline, as of November 30, 1993. We do not reach Ethyl's other legal challenges to EPA's actions.

## MMT's Registration Status Before the 1977 Amendments

MMT was developed as a fuel additive for increasing octane in the late 1950s, and its sales reached several hundred thousand pounds per year in the '60s. In the Air Quality Act of 1967, Congress established a registration program for fuel additives, Pub.L. No. 90–148, § 210, 81 Stat. 485, 535–36, and the U.S. Public Health Service published implementing regulations in 1970, 35 Fed.Reg. 9282 (1970). The regulations made registration a condition of sale and required that manufacturers provide information on recommended range of concentration and use, and chemical composition and structure. The same year, Ethyl registered MMT for use in "motor gasoline." Ethyl thereafter sold MMT for use in both leaded and unleaded gasoline.

Also in 1970, Congress amended the Act to transfer authority over the registration program to EPA. Following the Public Health Service regulations, Congress required that EPA designate fuels and fuel additives for registration, and prohibited sale of designated fuels that were not registered. Clean Air Act § 211(a). The Act required that manufacturers provide information on chemical composition, § 211(b)(1), and gave EPA discretion to require information on the effect of additives on emission control performance and public health or welfare, § 211(b)(2). Once EPA received the information it required, the Act said, the Administrator "shall

---

**1.** These are dated May 27, 1994 but appear in the June 27, 1994 Federal Register. EPA asserted that the regulations were effective May 27, 1994, see 59 Fed.Reg. 33042, but did not reconcile that claim with 5 U.S.C. § 553(d), specifying that

with limited exceptions rules take effect 30 days after publication. Whether they took effect May 27, 1994 or at any of the various later possible dates is irrelevant under the view we take of the matter.

register" the fuel or fuel additive. § 211(b)(3). In § 211(c), Congress permitted EPA to control or prohibit use of fuels or fuel additives that "endanger" public health or that significantly impair emissions control systems.

In 1975 EPA promulgated regulations implementing §§ 211(a) and (b)(1). For additives, EPA designated one general category for registration: "[a]ll additives" used in motor vehicle fuels, except for motorcycle fuels. 40 CFR § 79.31(a) (1976). The rules had a grandfathering clause deeming as registered under the new regulations all additives that had been registered before. *Id.* § 79.23(b). To maintain registration, manufacturers were simply required to file an information update within six months after promulgation of the rules. The rules spelled out the basic information needed to register an additive or to maintain registration, which included "[f]uels in which the use of the additive is recommended." *Id.* § 79.21(d).

Ethyl filed an information update within six months of promulgation of the 1975 rules. EPA prepared a list of registered fuel additives and put MMT on the list. Thereafter, during the 1970s, 1980s, and 1990s, EPA continually confirmed to Ethyl that MMT was registered. Indeed, as recently as February 1994, EPA sent Ethyl a "list of additives currently registered to Ethyl" and included MMT on the list.

*The Effect of the 1977 Amendments to the Clean Air Act*

In its 1977 amendments to the Clean Air Act, Congress made two important changes to the statutory scheme. First, § 211(e) required EPA to promulgate regulations under § 211(b)(2) for emissions and health testing no later than one year after August 7, 1977. Makers of fuels or additives already registered were required merely to submit the required testing results within three years of promulgation of the testing rules, whereas makers of ones not registered on that date were required to submit the data before registration. In the event, EPA promulgated the testing regulations nearly 16 years late, on May 27, 1994.

Second, as catalytic converters could not be used with leaded fuel, their adoption had led to a sharp rise in the use of MMT as an octane booster, and Congress responded to concerns that it and other fuel additives might harm the effectiveness of those converters. The 1977 amendments created a separate program for protecting emissions control systems by banning some additives, subject to a possible waiver. Section 211(f)(3) required that manufacturers of certain existing additives—those that were not "substantially similar" to constituents of fuel used in the certification of vehicles for emissions purposes for 1975 or later model years—stop distributing such additives effective September 15, 1978. The practical effect of this for MMT was to create a problem as to its use with unleaded gasoline only. The Report from the Senate Committee on Environment and Public Works had explained that use of MMT and other additives in *unleaded gasoline* was the only target, see S.Rep. No. 127, 95th Cong., 1st Sess. 90 (1977), and in 1980 EPA promulgated an interpretive rule defining "substantially similar" under § 211(f) in such a way as to cover only use in unleaded gasoline, not use in leaded gasolines and diesel fuels, 45 Fed. Reg. 67443 (1980). See also 46 Fed.Reg. 38582 (1981) (a revision maintaining that interpretation); 56 Fed.Reg. 5352 (1991) (similar). In any event, all agree that § 211(f)(3) barred MMT for use with unleaded gasoline. In order to temper the effects of § 211(f)(3)'s ban, Congress directed EPA in § 211(f)(4) to grant a waiver once it determined that the additive would not "cause or contribute to the failure of an emission control device or system." To spur prompt action by EPA, Congress provided that where the agency failed to act on an application within 180 days, the waiver would be "treated as granted."

In May 1990 Ethyl applied for a waiver under § 211(f)(4), thereby initiating a process in which EPA several times required further testing. Cf. *Ethyl Corp. v. Browner,* 989 F.2d 522, 524 (D.C.Cir.1993) (remanding case to EPA for consideration of data said to undermine data on which EPA had relied in denial of a waiver). Ultimately, on November 30, 1993, EPA found that MMT did not "cause or contribute" to the failure of emis-

sions control systems—the sole criterion for granting an f(4) waiver—but nonetheless asserted authority to deny the waiver on the ground that Ethyl had not yet established the absence of any health effects. 58 Fed. Reg. 64761 (Dec. 9, 1993). In response to this assertion of authority—which we held invalid in *Ethyl I*—Ethyl agreed to withdraw and resubmit its application to give EPA additional time to consider health effects, but with EPA's favorable finding on emissions effects now firmly on record. Ethyl also reserved the right to argue that health was an irrelevant factor under § 211(f)(4). Under a later agreement the parties agreed to extend the deadline on the renewed application from May 27, 1994 to July 13, 1994, with Ethyl agreeing not to argue that the delay caused a default grant of the waiver under § 211(f)(4)'s 180–day rule.

In April 1992 EPA issued proposed testing rules under § 211(b)(2). 57 Fed.Reg. 13168 (April 15, 1992). The proposal called for a three-tier system. Tier 1 involved a literature search. If it proved inadequate, the applicant would move to Tier 2, short-term animal tests. Where these were thought to leave a likelihood of unacceptable health risks, the applicant would move to Tier 3, with tests to be devised specific to the particular additive. In the case of new additives, Tier 3 could be completed after registration. In a February 1994 reopening notice, however, EPA proposed to reverse the sequence, requiring the more extensive case-specific testing for new additives—called Tier 3 or "alternative Tier 2"—*before* registration. 59 Fed.Reg. 8886 (February 24, 1994).

On May 27, 1994 EPA promulgated its final testing rule, 59 Fed.Reg. 33042, differing in several important respects from the proposed rule, and from the 1975 rules. First, it provided that in order to register an additive for use in unleaded fuel, a manufacturer must demonstrate either that the additive is "substantially similar" to constituents of unleaded fuel used for certification of vehicles for emissions control purposes or that the manufacturer has obtained a waiver under § 211(f)(4). *Id.* at 33093/2; 40 CFR § 79.21(h). Second, EPA required that registration of an additive be specific to its use

in particular types of fuel. 59 Fed.Reg. at 33092/3; 40 CFR § 79.4(b)(1). Thus it established—or, as it claims, clarified—that a manufacturer's entry for "recommended usage" on EPA's regular form for filing updating information was not a mere recommendation but a limit on the type of fuel for which the additive was legally registered. Finally, EPA adopted its proposed three-tier testing program, as modified by its February 1994 notice.

*EPA's July 1994 Decisions*

On July 13, 1994, EPA simultaneously dealt two separate blows to Ethyl's expectations. It denied Ethyl's f(4) waiver application, 59 Fed.Reg. 42227 (August 17, 1994), and, in a letter to Ethyl (the "Registration Letter"), it found that, under the 1994 regulations, MMT was not registered for use in unleaded gasoline. In denying the f(4) waiver, EPA continued to acknowledge the absence of effects on emission controls, but said that "[a]lthough it is impossible to state whether a health risk would definitely exist at the projected exposure levels, neither can the possibility of such a risk be ruled out." *Id.* at 42259/3. We reversed the waiver denial on April 14 of this year, as it "violated the clear terms of section 211(f)(4) in denying Ethyl a waiver for MMT on public health grounds." *Ethyl I*, 51 F.3d at 1055. Because EPA had made the sole determination necessary to grant the waiver, we instructed it to do so. *Id.* at 1065.

EPA's finding that MMT was not registered for use in unleaded gasoline took the form of a response to Ethyl's April 27, 1994 letter to EPA enclosing what Ethyl regarded as simply an update of its MMT registration. EPA's Registration Letter treated Ethyl's update as an effort to "amend" its registration of MMT to encompass use in unleaded fuel. It relied on the newly promulgated testing regulations, 40 CFR § 79.21(h), for the conclusion that an additive could not be registered for a particular use unless it met the "substantially similar" criterion or had received an f(4) waiver, which of course EPA was simultaneously denying. Further, because the registration of MMT for unleaded gasoline was "new" under the 1994 rules, the Registration Letter said that Ethyl would

have to perform all required testing *before* registration. Ethyl has filed a timely petition to review the 1994 testing regulations and the Registration Letter.

*Nunc Pro Tunc Treatment of the MMT Waiver and Registration*

■ An order nunc pro tunc (literally "now for then") is an equitable remedy traditionally used to apply a court's own order or judgment retroactively. Nunc pro tunc relief is "available in order to promote 'fairness to the parties,' and 'as justice may require'". *Weil v. Markowitz*, 898 F.2d 198, 200 (D.C.Cir.1990) (quoting *Mitchell v. Overman*, 103 U.S. 62, 65, 26 L.Ed. 369 (1881)). This circuit has extended the traditional doctrine to embrace agency conduct, where necessary to put the victim of agency error "in the economic position it would have occupied but for the error." *Delta Data Systems Corp. v. Webster*, 744 F.2d 197, 206–07 (D.C.Cir.1984). For example, where the FCC demanded strict compliance with requirements for filing license applications under a deadline but failed to give adequate notice of what those requirements were, we vacated the FCC's order dismissing the applications and remanded to the agency to reinstate them nunc pro tunc. *Salzer v. FCC*, 778 F.2d 869, 875–76 (D.C.Cir.1985). See also *McElroy Electronics Corp. v. FCC*, 990 F.2d 1351, 1353 (D.C.Cir.1993) (same); *Maxcell Telecom Plus v. FCC*, 815 F.2d 1551, 1560 (D.C.Cir. 1987) (same); *Delta Data Systems Corp.*, 744 F.2d at 206–07 (where agency erred in treatment of bidder, court held that bidder could require the agency to reselect a winning contractor nunc pro tunc). And in *Office of Consumers' Counsel v. FERC*, 826 F.2d 1136, 1139 (D.C.Cir.1987), where the Commission had found rates unlawful but failed to order a remedy, we ordered (though without use of the Latin tag) that it provide the necessary remedy, retroactive to the date of its finding of unlawfulness.

■ This court in *Ethyl I* has already found that EPA's denial of Ethyl's requested f(4) waiver on November 30, 1993 rested exclusively on an unlawful ground. Although the question of the date the waiver should have been granted was not before the court, it is undisputed that the statutory 180 days

ran on November 30, 1993, and that *only* the EPA's unlawful infusion of health issues into the f(4) process prevented the issuance of the waiver on that date. EPA's refusal to do so has—under *EPA's* view of the registration process—caused MMT not to be registered when the new regulations were promulgated in June 1994. Ethyl can be put "in the economic position it would have occupied but for the error" if the waiver and registration for unleaded gasoline are treated as granted as of November 30, 1993; our cases amply support that result.

EPA argues that Ethyl's agreements to extend the deadline to May 27, 1994 (and then to July 13, 1994) bar it from this relief. EPA Br. at 53. But Ethyl's first deferral agreement arose from one source—EPA's unlawful interpretation of its authority under § 211(f)(4) and concomitant threat to deny the f(4) waiver unless Ethyl agreed to the withdrawal and resubmission. The second deferral arose out of the same problem. As to the latter, EPA points to Ethyl's agreement not to claim a waiver on the basis of EPA's exceeding the (extended) 180–day limit. But Ethyl's position here is consistent with that promise. Ethyl is not invoking the 180–day default: it is asking only that EPA's favorable decision on the legally relevant standard be given full effect.

This treatment of the waiver compels nunc pro tunc treatment of MMT's registration. Because the only barrier to Ethyl's registering MMT as an additive for use in unleaded fuel before promulgation of the 1994 regulations was lack of a § 211(f)(4) waiver, as EPA counsel acknowledged at oral argument, Tr. at 31, a complete remedy for Ethyl requires that the registration be treated as taking effect on approximately the date it would have occurred if EPA had acted lawfully—November 30, 1993.

*Issues Not Reached*

There are a number of claims by Ethyl that we do not reach, either because our holding above makes their resolution unnecessary or because they are unripe. First, in view of the registration of MMT per this decision, there is no need to reach Ethyl's contentions that EPA has acted arbitrarily

and capriciously in asserting that the registration of MMT for use in unleaded fuel was revoked when the 1977 amendments to the Clean Air Act barred its sale for those purposes without a waiver, or that, even if EPA could reasonably interpret its regulations as implying such a revocation, it denied Ethyl fair notice of that interpretation. Cf. *General Electric v. EPA*, 53 F.3d 1324, 1333–34 (D.C.Cir.1995) (holding that where the regulations are unclear and petitioner's interpretation is reasonable, "a regulated party is not 'on notice' of the agency's ultimate interpretation of the regulations, and may not be punished"); *Satellite Broadcasting Co. v. FCC*, 824 F.2d 1, 2 (D.C.Cir.1987) (applying similar principle to denial of license). Nor need we reach Ethyl's contention that EPA lacked statutory authority to limit additive registration to sale for use in specific fuels.

Second, Ethyl challenges the 1994 testing rules apart from their purported effect on registration. Ethyl's challenge is two-fold. First, it contends that the rules are unlawfully open-ended. They provide that "EPA retains the authority to modify the standard Tier 2 test requirements" in any specific case, with the exercise of this authority to be "wholly at EPA's initiative and discretion." 59 Fed.Reg. at 33081/2. Ethyl claims that this reservation of power to up the ante at any time, and to delay testing by the time-consuming establishment of new protocols, is contrary to § 211(b)(2), which provides that testing under the section "shall be conducted in conformity with test procedures and protocols established by the Administrator," and to § 211(e), which provides that "the Administrator shall promulgate regulations which implement the authority under subsection (b)(2)(A) and (B)."

Ethyl also objects to the standard that EPA has indicated it may apply in evaluating test results under the 1994 regulations implementing § 211(b)(2)—a standard suggested not in the 1994 regulations themselves but in EPA's July 13, 1994 decision purporting to deny the f(4) waiver. There, EPA implicitly construed § 211(c)(1)(A) (permitting EPA to control or prohibit fuels or fuel additives that "may reasonably be anticipated to endanger" public health or welfare based on information gathered under § 211(b)(2)) as justifying nonregistration (or deregistration) where there was "a reasonable basis for concern about the [health] effects" of an additive. 59 Fed.Reg. at 42460/3. In *Ethyl I* we characterized this formulation as "a bizarre departure from existing practice [under § 211(c)], in complete defiance of the plain terms of the statutory criterion and with no explanation whatsoever for the application of a different standard." 51 F.3d at 1063. More important for our purposes, EPA's waiver decision stated that it was applying the standard established by the 1994 testing regulations, see 59 Fed.Reg. 42257/3, and that the standard is "consistent with the general policy" established by the 1994 regulations under § 211(b)(2), *id.* at 42260/3. If this is what the 1994 testing regulations mean, Ethyl argues, we must find them invalid to that extent, even though the regulations themselves do not articulate a substantive standard.

Neither set of claims is ripe in this context. In the first place, our decision ordering the registration of MMT effective November 30, 1993 goes far to eliminate any harm that Ethyl might suffer from delay in resolution of its claims. See *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 151–54, 87 S.Ct. 1507, 1516–18, 18 L.Ed.2d 681 (1967). With MMT registered, nothing in the statutory scheme suggests that Ethyl would suffer the burden of any delay in the testing process. Further, the relation of the testing scheme to the statutory requirements invoked by Ethyl seems precisely the sort of issue that can proceed "on a much surer footing in the context of a specific application ... than ... in the framework of the generalized challenge made here." *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967). As to the substantive standard expressed in the waiver denial, we think Ethyl's theory requires too much of a stretch. Even though the waiver denial may have reflected an assumption that the 1994 testing regulations adopted the substantive standard stated there for § 211(c) purposes, the testing regulations themselves never said so and *Ethyl I* has already nullified the waiver denial itself; there just isn't enough to review.

Accordingly, the EPA must treat MMT for all purposes as registered under § 211(a) no later than November 30, 1993. Ethyl's other claims are not reached, either because it is unnecessary to do so or because the claims are unripe in this context.

*So ordered.*