REVISED August 4, 2020

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 3, 2020

No. 19-30006

Lyle W. Cayce
Clerk

GULF FISHERMENS ASSOCIATION; GULF RESTORATION
NETWORK; DESTIN CHARTER BOAT ASSOCIATION; ALABAMA
CHARTER FISHING ASSOCIATION; FISH FOR AMERICA USA,
INCORPORATED; FLORIDA WILDLIFE FEDERATION;
RECIRCULATING FARMS COALITION; FOOD & WATER WATCH,
INCORPORATED; CENTER FOR FOOD SAFETY,

*Plaintiffs—Appellees*,

*versus*

NATIONAL MARINE FISHERIES SERVICE; EILEEN SOBECK, IN
HER OFFICIAL CAPACITY AS ASSISTANT ADMINISTRATOR FOR
FISHERIES; DOCTOR ROY CRABTREE, IN HIS OFFICIAL
CAPACITY AS REGIONAL ADMINISTRATOR, SOUTHEAST REGION,
NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION;
DOCTOR KATHRYN SULLIVAN, IN HER OFFICIAL CAPACITY AS
UNDER SECRETARY OF COMMERCE FOR OCEANS AND
ATMOSPHERE AND ADMINISTRATOR FOR NATIONAL OCEANIC
AND ATMOSPHERIC ADMINISTRATION; WILBUR ROSS, IN HIS
OFFICIAL CAPACITY AS UNITED STATES SECRETARY OF
COMMERCE,

*Defendants—Appellants*.

No. 19-30006

―――――――――――――

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:16-CV-1271

―――――――――――――

Before Higginbotham, Higginson, and Duncan, *Circuit Judges*.
Stuart Kyle Duncan, *Circuit Judge*:

We consider whether a federal agency may create an "aquaculture," or fish farming, regime in the Gulf of Mexico pursuant to the Magnuson-Stevens Fishery Conservation and Management Act of 1976 ("Magnuson-Stevens Act" or "Act"), 16 U.S.C. §§ 1801–83. The answer is no. The Act neither says nor suggests that the agency may regulate aquaculture. The agency interprets this silence as an invitation, but our precedent says the opposite: Congress does not delegate authority merely by not withholding it. *See Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016). Undaunted, the agency seeks authority in the Act's definition of "fishing"—the "catching, taking, or *harvesting* of fish." 16 U.S.C. § 1802(16) (emphasis added). "Harvesting," we are told, implies gathering crops, and in aquaculture the fish are the crop. That is a slippery basis for empowering an agency to create an entire industry the statute does not even mention. We will not bite. If anyone is to expand the forty-year-old Magnuson-Stevens Act to reach aquaculture for the first time, it must be Congress.

We therefore AFFIRM the district court's ruling that the challenged aquaculture rule exceeds the agency's statutory authority. *See* 81 Fed. Reg. 1762 (Jan. 13, 2016), *codified at* 50 C.F.R. pts. 600 and 622.

No. 19-30006

## I.

## A.

The Magnuson-Stevens Act seeks to "conserve and manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1); *see also Delta Commercial Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council*, 364 F.3d 269, 271 (5th Cir. 2004) (the Act "aims to preserve fishery resources by preventing overfishing"). Congress passed the Act in 1976 after finding that aggressive fishing practices, especially by foreign trawlers, had imperiled important fish stocks and the coastal economies dependent on them.[1] *See* 16 U.S.C. § 1801(a)(2) (finding the economies of "[m]any coastal areas . . . have been badly damaged by the overfishing of fishery resources," particularly by "[t]he activities of massive foreign fishing fleets"). Accordingly, the Act provides a framework for protecting and managing fishing and fishery resources in federal waters. *See id.* §§ 1801(b), (c) (stating Act's purposes and policies).

As relevant here, the Act creates eight Regional Fishery Management Councils and tasks them with drafting Fishery Management Plans ("FMPs"). *Id.* §§ 1801(b)(5), 1852–53. Each FMP must identify and describe the fishery to which it applies, *id.* § 1853(a)(2), and contain "conservation and management measures" that are "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery," *id.* § 1853(a)(1)(A). In addition, each FMP must "be consistent with" ten "national standards." *Id.* § 1851(a). Among these standards are requirements

---

[1] *See* Robert J. McManus, *America's Saltwater Fisheries: So Few Fish, So Many Fisherman*, 9 NAT. RESOURCES & ENV'T 13, 13 (Spring 1995).

to "prevent overfishing while achieving . . . the optimum yield from each fishery." *Id.* § 1851(a)(1).[2]

Today, the Act is administered by the National Marine Fisheries Service ("NMFS" or the "agency"), a division of the National Oceanic and Atmospheric Administration, by delegation from the Secretary of

---

[2] These are the ten standards:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(4) Conservation and management measures shall not discriminate between residents of different States. . . .

(5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall . . . take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet [certain] requirements . . . .

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

16 U.S.C. § 1851(a).

Commerce. *See id.* §§ 1854, 1855. NMFS reviews each FMP for consistency with the Act and other applicable laws. If NMFS fails to act within a specified period of time after the council submits an FMP, the plan is approved. *Id.* § 1854(a)(3). Each plan is then implemented through separate regulations, which NMFS reviews, *id.* § 1853(c), and, upon approval, implements through final rules, *id.* § 1854(b).[3]

The concept of a "fishery" is central to the Act and to the issues we consider in this case. The Act defines "fishery" as follows:

> (A) one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics; and
>
> (B) any fishing for such stocks.

*Id.* § 1802(13). "Fishing," in turn, is defined as:

> (A) the catching, taking, or harvesting of fish;
>
> (B) the attempted catching, taking, or harvesting of fish;
>
> (C) any other activity which can reasonably be expected to result in the catching, taking, or harvesting of fish; or
>
> (D) operations at sea in support of, or in preparation for any activity described in subparagraphs (A) through (C).

---

[3] *See generally Anglers Conserv. Network v. Pritzker*, 809 F.3d 664, 667–68 (D.C. Cir. 2016) (discussing administration of the Act); *Lovgren v. Locke*, 701 F.3d 5, 13 (1st Cir. 2012) (same); *General Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce*, 635 F.3d 106, 108–09 (3rd Cir. 2011) (same); *Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1108 (9th Cir. 2006) (same).

*Id.* § 1802(16). When passed, the Act made no reference to aquaculture or fish farming.[4]

## B.

The Gulf of Mexico Fishery Management Council (the "Council") comprises Texas, Louisiana, Mississippi, Alabama, and Florida. *Id.* § 1852(a)(1)(E). The Council has "authority over the fisheries in the Gulf of Mexico seaward of" those five states. *Id.* In 2009, it became the first regional council to put forward a plan to regulate and permit aquaculture. In common terms, aquaculture means fish farming: it is "the cultivation of aquatic organisms (such as fish or shellfish) especially for food."[5] The practice typically entails planting "broodstock," or wild-caught fish, to spawn the rest of the aquaculture stock, which are then harvested. *Id.*[6] As NMFS explains, aquaculture "is essentially a farming operation, [in which] all animals cultured are intended for harvest." 81 Fed. Reg. 1762, 1770 (Jan. 13, 2016).

The Council developed a "Plan for Regulating Offshore Marine Aquaculture in the Gulf of Mexico" (the "Plan"). Under the Plan, the Council would approve five to twenty permits for aquaculture operations over a ten-year period. Permits would be conditioned on compliance with biological, environmental, recordkeeping, and reporting conditions. The Council submitted the Plan and a proposed implementing regulation to

---

[4] As the district court noted, later amendments contain "discrete and immaterial" references to aquaculture. These post-enactment references, as we explain below, lend further support to our decision.

[5] Merriam-Webster Dictionary, *Aquaculture* (last visited June 23, 2020), https://www.merriam-webster.com/dictionary/aquaculture.

[6] NMFS defines "aquaculture," somewhat circularly, as "all activities, including the operation of an aquaculture facility, involved in the propagation or rearing, or attempted propagation or rearing, of allowable aquaculture species in the Gulf [Exclusive Economic Zone]." 50 C.F.R. § 622.2.

NMFS. After NMFS took no position on the Plan, it went into effect. In 2014, NMFS published a proposed Rule to implement the Plan, which became final in 2016.[7]

In its own words, the Rule "establishes a comprehensive regulatory program for managing the development of an environmentally sound and economically sustainable aquaculture fishery in Federal waters of the Gulf." 81 Fed. Reg. at 1762. Its purpose is "to increase the yield of Federal fisheries in the Gulf by supplementing the harvest of wild caught species with cultured product." *Id.* To that end, the Rule requires aquaculture facilities to obtain aquaculture permits. *See id.* at 1763 (describing requirements for permit applications). Applications are submitted to NMFS's Southeast Regional Administrator (the "RA") who may grant or deny the permit. The Rule provides for a 45-day notice-and-comment period upon an application's completion. *Id.* A permit is valid for ten years initially and must be renewed every five years thereafter. *Id.* at 1762. The Rule contains a number of "operational requirements, monitoring requirements, and restrictions" for permittees. *Id.* at 1763–64. Permittees must allow NMFS personnel and NMFS-designated third parties access to their facilities to "conduct inspections and determine compliance with applicable regulations." *Id.* at 1765. Finally, the Rule contains a plethora of reporting and recordkeeping requirements, *id.* at 1766, and requires permittees to comply with various regulations promulgated by other federal agencies, including the Environmental Protection Agency ("EPA"), *id.* at 1763, and the Department of Agriculture, *id.* at 1764.

---

[7] *See* Fisheries of the Caribbean, Gulf, and South Atlantic; Aquaculture, 79 Fed. Reg. 51,424 (Aug. 28, 2014); Fisheries of the Caribbean, Gulf, and South Atlantic; Aquaculture, 81 Fed. Reg. 1762 (Jan. 13, 2016), *codified at* 50 C.F.R. pts. 600 and 622.

The Rule is the first attempt by NMFS or any council to regulate aquaculture under the Act. It is no small attempt. The Rule allows for a maximum annual production of 64 million pounds of seafood in the Gulf. *Id.* That figure would equal the previous average annual yield "of all marine species in the Gulf[] except menhaden[8] and shrimp." *Id.*

## C.

A coalition of fishing and conservation organizations ("Plaintiffs"),[9] concerned about the commercial and environmental impacts of the Rule's proposed regime,[10] challenged the Rule in district court. They claimed the Rule was invalid because it fell outside the Council's authority to regulate "fisheries" under the Act. The parties cross-moved for summary judgment. Relying on the Act's text, structure, and history, the district court held the Act unambiguously forecloses NMFS's authority to regulate aquaculture. The court thus denied *Chevron* deference to the agency's construction of the Act and granted Plaintiffs summary judgment. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) (courts will not defer to agency interpretation of an "unambiguous[]" statute). The agency

---

[8] Menhaden are prolific fish used for bait and fish oil. MERRIAM-WEBSTER DICTIONARY, *Menhaden*, https://www.merriam-webster.com/dictionary/menhaden (last visited June 23, 2020).

[9] The organizations (Appellees here) are Gulf Fishermens Association, Gulf Restoration Network, Destin Charter Boat Association, Alabama Charter Fishing Association, Fish for America USA, Inc., Florida Wildlife Federation, Recirculating Farms Coalition, Food & Water Watch, Inc., and Center for Food Safety. Defendants (Appellants here) are NMFS, the National Oceanic and Atmospheric Administration, and three officers charged with administering the Act. Where appropriate, "agency" and "NMFS" refer to all Defendants.

[10] Specifically, Plaintiffs worry that the Rule's expansion of seafood production will harm traditional fishing grounds, reduce prices of wild fish, subject wild fish to disease, and pollute open waters with chemicals and artificial nutrients.

appealed. Before us, it argues the Act is ambiguous as to whether it encompasses aquaculture. Because the Rule reasonably resolves this putative ambiguity, the agency claims it earns *Chevron* deference. *See id.* at 844 (when statute is ambiguous, "a court may not substitute its own construction . . . for a reasonable interpretation made by the administrator of an agency").

## II.

"We review a summary judgment *de novo*." *Salinas v. R.A. Rogers, Inc.,* 952 F.3d 680, 682 (5th Cir. 2020) (citation omitted). Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The Administrative Procedure Act requires setting aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We review an agency's statutory interpretation—including one concerning the agency's own jurisdiction—under the two-step *Chevron* framework. *See generally Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1014 (5th Cir. 2019) (discussing *Chevron*); *see also City of Arlington, Tex. v. FCC,* 569 U.S. 290, 306–07 (2013). At step one, we ask "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. We answer that question by "exhaust[ing] all the 'traditional tools' of construction," including "text, structure, history, and purpose." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (quoting *Chevron*, 467 U.S. at 843 n.9; *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 707 (1991) (Scalia, J., dissenting)). Our interpretation "must account for both the specific context in which language is used and the broader context of the statute as a whole." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) (citation omitted) (cleaned up). We will not defer to "an agency interpretation that is inconsistent with the design and structure

of the statute as a whole." *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013)) (cleaned up). If that holistic reading of the statute settles the matter, *Chevron* ends: we "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 843. On the other hand, if the statute is "truly ambiguous" on the question, *Kisor*, 139 S. Ct. at 2415, we proceed to step two, "asking whether the agency's construction is 'permissible.'" *Sw. Elec. Power Co.*, 920 F.3d at 1014 (quoting *Chevron*, 467 U.S. at 843). A permissible construction is one that "reasonabl[y] accommodat[es] . . . conflicting policies that were committed to the agency's care by the statute." *Chevron*, 467 U.S. at 845 (quoting *United States v. Shimer*, 367 U.S. 374, 382 (1961)).

## III.

We first ask whether the Magnuson-Stevens Act unambiguously precludes the agency from creating an aquaculture regime. The answer is yes. *Chevron* step one is thus the only step we need take to resolve this appeal.

## A.

We usually start with the text, but more telling here is the Act's lack of text. As far as aquaculture, the Magnuson-Stevens Act is a textual dead zone: the original Act does not mention aquaculture or fish farming at all.[11] More to the point, the Act's provisions defining the agency's regulatory power say nothing about creating or administering an aquaculture or fish farming regime. *Cf., e.g.*, 16 U.S.C. §§ 1802, 1854, 1855. The agency concedes this but asks us to treat the chasm as a mere "gap" for it to fill. That is, the agency argues it has power to regulate aquaculture because the Act

---

[11] Later amendments contain a few references to aquaculture. We explain below why those references actually support our holding.

"do[es] not unambiguously express Congress's intent to prohibit the regulation of aquaculture."

This nothing-equals-something argument is barred by our precedent. In *Texas v. United States*, we held the Immigration and Naturalization Act ("INA") unambiguously foreclosed the Department of Homeland Security's ("DHS") Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). 809 F.3d 134, 186 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016). Acknowledging that many of DAPA's provisions were not expressly foreclosed by the INA, we still rejected the argument that "congressional silence has conferred on DHS the power to act." *Id. Chevron* step two is not implicated, we said, merely because "a statute does not expressly negate the existence of a claimed administrative power." *Id.* at 186 (quoting *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995)) (emphasis in original). "Were courts to presume a delegation of power absent an express *withholding* of such power," we explained, "agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Id.* (quoting *Ethyl*, 51 F.3d at 1060).[12]

Similarly, in *Ethyl*, on which we relied in *Texas*, the D.C. Circuit rejected EPA's construction of a provision of the Clean Air Act ("CAA"). 51 F.3d at 1054. The CAA prohibits fuel additives but directs EPA to waive the prohibition for additives that do not interfere with a vehicle's emissions-control systems. *Id.* (citing 42 U.S.C. § 7545(f)(4)). EPA determined the

---

[12] *See also Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015) ("[A]n administrative agency does not receive deference under *Chevron* merely by demonstrating that 'a statute does not expressly negate the existence of a claimed administrative power . . . .'" (quoting *Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) (emphasis in original)).

petitioner had satisfied that criterion but denied waiver, imagining it could "consider other factors" in its waiver decision, including public health. *Id.* (citation omitted). The agency argued that because the emissions provision did not mention public health, "Congress ha[d] not directly spoken on the issue of whether [EPA] may consider the public health implications of fuel additives before granting or denying a . . . waiver." *Id.* The D.C. Circuit set aside the decision, rejecting "the notion that if Congress has not mentioned public health in [the additive provision], then Congress is 'silent or ambiguous' as to that issue" for *Chevron* purposes. *Id.* at 1070 (quoting *Chevron*, 467 U.S. at 843). The provision was not "ambiguously worded" and did not "direct the Agency to adopt implementing regulations" to determine its meaning. *Id.* "Rather, the statutory waiver provision unambiguously expresse[d] Congress's intent that the [EPA] consider a fuel additive's effects on vehicles meeting emission standards." *Id.*[13]

Here, NMFS's argument parallels DHS's in *Texas* and EPA's in *Ethyl*. The agency claims, not that Act affirmatively empowers it to regulate aquaculture, but that the Act fails to "express[] Congress's unambiguous intent to *foreclose* the regulation of aquaculture." As *Texas* and *Ethyl* teach, this argument gets *Chevron* backwards. "It is only legislative *intent to delegate* such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron*." *Ethyl*, 51 F.3d at 1060 (quoting *Nat. Res. Defense Council v. Reilly*, 983 F.2d 259, 266 (D.C. Cir. 1993)) (cleaned up); *see also Am. Bus Ass'n v. Slater*, 231 F.3d 1, 9 (D.C. Cir. 2000) (Sentelle, J., concurring) ("In order for there to be

---

[13] *Accord Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 805 (D.C. Cir. 2002) (rejecting as "entirely untenable" agency position that adopting certain rules "is permissible because Congress did not expressly foreclose the possibility" (citing *Ry. Labor Executives' Ass'n*, 29 F.3d at 671)).

an ambiguous grant of power, there must be a grant of power in the first instance."). Instead of identifying any intent to delegate authority here, the agency can claim only that Congress did not withhold the power the agency now wishes to wield. Once again, this is the argument that presumes power given if not excluded. We have resisted that siren song before, *see Texas*, 809 F.3d at 186, and we again decline to be seduced.

Fond of animal metaphors, courts like to say "Congress does not 'hide elephants in mouseholes.'" *Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 376 (5th Cir. 2018) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)). The agency's argument here is all elephant and no mousehole. It asks us to believe Congress authorized it to create and regulate an elaborate industry the statute does not even mention. Because we cannot suspend our disbelief that high, we reject the agency's position.

**B.**

Unable to land support for its interpretation in the words of the Act, the agency goes angling for ambiguity. It argues the Act's text is sufficiently open-ended to give it leeway to create an aquaculture regime. *See, e.g., Cuozzo Speed Technologies, LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016) (explaining, "where a statute leaves a 'gap' or is 'ambiguous,' we typically interpret it as granting the agency leeway" to regulate (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001) (cleaned up)). The agency fixes on the word "harvesting" in the definition of "fishing." *See* 16 U.S.C. § 1802(16) ("fishing" means "the catching, taking, or harvesting of fish"). Recall that the Act empowers councils to regulate "fisheries," *id.* § 1852(a)(1)(E), whose definition includes "fishing" for stocks of fish, *id.* § 1802(13)(B). The agency contends the word "harvesting" is roomy enough to include

aquaculture, because it may mean gathering or reaping a crop.[14] The crop reaped from an aquaculture "fishery," we are told, would be the farmed fish. The district court correctly rejected this argument.

To address the agency's argument, we focus first on the words of the definition itself—the "catching, taking, or harvesting of fish." *Infra* III(B)(1). We then situate that definition within the Act's broader structure. *Infra* III(B)(2). Through either lens, the agency's implausible reading of the definition of "fishing" to encompass aquaculture does not fall "within the range of meanings that could be plausibly attributed to the relevant statutory language." *Sw. Elec. Power Co.*, 920 F.3d at 1024 (quoting Richard J. Pierce, Jr., Administrative Law Treatise § 3.6).

**1.**

First, the words. The agency puts far more weight on "harvesting" in § 1802(16) than it can bear. It argues that one meaning of the term ("gathering a crop") quietly opens the door to an elaborate regime of farming fish for "harvest."

That is not how to read statutes. As the district court reasoned, far better to read "harvesting" as synonymous with the adjacent terms "catching" and "taking." *See, e.g., United States v. Buluc*, 930 F.3d 383, 390 (5th Cir. 2019) (discussing *noscitur a sociis* or "associated-words" canon under which a "string of statutory terms . . . should be given related meaning" (quoting *S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370,

---

[14] *See, e.g.,* Oxford English Dictionary, *harvest, v.,* https://tinyurl.com/y9ssjdo4 (last visited June 23, 2020) (defining "harvest" as "[t]o reap and gather in" a "ripe crop").

No. 19-30006

378 (2006))).[15] "Catching" and "taking" both mean "seizing" or "capturing" an organism—here, fish.[16] As the district court put it, these terms "more appropriately describe traditional fishing activities," and so "harvesting" more likely "refer[s] only to the traditional fishing of wild fish." One dictionary entry does not override a term's surrounding context. The reverse is true: a word with "many dictionary definitions . . . must draw its meaning from its context." *Kucana v. Holder*, 558 U.S. 233, 245 (2010) (cleaned up).[17] "Harvesting" may also mean "[t]o kill or remove wild animals" from their habitat. [18] Linking the term with "catching" and "taking" in § 1802(16) points to that meaning rather than to "gathering a crop."

The agency objects to this use of the associated-words canon, arguing the definition's "structure" shows the three terms were not meant to have similar meaning. The agency does not explain why this is so. All the canon requires is an "association" or "gathering" of terms that "have some quality

---

[15] *See also* Antonin Scalia & Bryan A. Garner, Reading Law 195 (2012) (the canon advises that "words grouped in a list should be given related meanings" (quoting *Third Nat'l Bank in Nashville v. Impac Ltd.,* 432 U.S. 312, 322 (1977))).

[16] *See* Webster's Third New International Dictionary 351 (1986) (defining "catching" as "to capture or seize"); id. at 2329 (defining "take" as "to seize or capture physically").

[17] *See also Kirtseang v. John Wiley & Sons, Inc.*, 568 U.S. 519, 531 (2013) (same); *Ardestani v. INS,* 502 U.S. 129, 135 (1991) (same); *see generally* Scalia & Garner at 418 (whereas a dictionary definition "states the core meanings of a term," it "cannot delineate the periphery" and readers must "use the context in which a given word appears to determine its aptest, most likely sense").

[18] Oxford English Dictionary, *harvest*, *v.*, https://tinyurl.com/y9ssjdo4 (last visited June 23, 2020); *see also* Merriam-Webster Dictionary, *harvest*, *v.*, https://tinyurl.com/yc7nkfa9 (last visited June 23, 2020) (defining "to harvest" as "to gather, catch, hunt, or kill (salmon, oysters, deer, etc.) for human use, sport, or population control") (second definition).

in common." *See Buluc*, 930 F.3d at 390–91 (quoting *S.D. Warren Co.*, 547 U.S. at 379–80; SCALIA & GARNER at 196 (2012)). When referring to "fish," the terms have a common meaning.[19] For instance, federal courts often use the terms "catch," "take," and "harvest" interchangeably when discussing fish. *See, e.g., Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 663, 664 (1979) (referring to migrating salmon that would be "caught or 'harvested,'" as well as "tak[en]," by fishermen).[20] Indeed, in other provisions Magnuson-Stevens itself uses the term "harvest" as synonymous with a "catch" of fish.[21]

---

[19] For that reason, the agency's reliance on *Graham County Soil & Water Conservation District v. United States*, 559 U.S. 280 (2010), is mistaken. *Graham County* declined to apply the canon to make the phrase "congressional, administrative, or GAO" in the False Claims Act mean "congressional, *federal* administrative, or GAO." 559 U.S. at 286 (quoting 31 U.S.C. § 3730(e)(4)(A)). In that case, however, the listed words—unlike those before us—were "quite distinct from each other" and "too disparate" to trigger the canon. *Id.* at 288, 289. The district court properly relied on *Jarecki v. G.D. Searle & Co.* for the proposition that while the *noscitur a sociis* canon is not "inescapable," it is "often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." 367 U.S. 303, 307 (1961). This is just such a situation: the canon saves the definition of "fishing" from a construction that would drastically (and, as discussed in the next section, awkwardly) expand the Act.

[20] *See also Yates v. United States*, 574 U.S. 528, 531 (2015) (plurality op.) ("John Yates, a commercial fisherman, *caught* undersized red grouper in federal waters in the Gulf of Mexico. To prevent federal authorities from confirming that he had *harvested* undersized fish, Yates ordered a crew member to toss the suspect *catch* into the sea."); *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 269 n.3 (1977) (discussing the U.S. menhaden "fishery" and interchangeably using the terms "catch," "harvest," "taken," and "caught"); *Trawler Diane Marie, Inc. v. Kantor*, 91 F.3d 134 (4th Cir. 1996) (Table) ("With the renouncement of its Alaskan registration, the MR. BIG . . . could *harvest* as many scallops as it could *catch* and carry.") (emphases added).

[21] *See, e.g.,* 16 U.S.C. § 1802(23) (defining "individual fishing quota" as a "limited access system to harvest a quantity of fish, expressed by . . . a percentage of the total allowable *catch* of a fishery" (emphases added)); *id.* § 1802(26) (same); *id.* § 1821(h)(2)(A) (referring to "a situation where a fleet of *harvesting* vessels transfers its *catch* . . . to another vessel" (emphases added)); *id.* § 1855(i)(1)(B)(i) (referring to "the annual percentage of

No. 19-30006

The agency also objects that the district court wrongly injected the concept of "traditional fishing of wild fish" into the Act. That is a puzzling objection, given one of the Act's goals is to remedy the "overfishing of fishery resources" caused by "[c]ommercial and recreational fishing," as well as "the activities of massive foreign fishing fleets." 16 U.S.C. § 1801(3).[22] To us, this sounds like concern over "traditional fishing of wild fish." In any event, the agency misunderstands the district court's rationale. The court used the phrase "traditional fishing of wild fish" merely to contrast with "farming of fish." Specifically, it reasoned that "catching" and "taking" are terms that "describe traditional fishing activities and would be awkward in reference to the farming of fish." Just so, the term "harvesting should be read similarly to refer only to the traditional fishing of wild fish." This is a straightforward—and correct—use of the associated-words canon to pin down the most likely meaning of "harvesting."[23]

---

the total allowable *catch*, guideline *harvest* level, or other annual *catch* limit" (emphases added)); *id.* § 1881a(e)(2)(B) (Secretary may structure private fishery surveys "by permitting the contractor to *harvest* on a subsequent voyage and retain for sale a portion of the allowable *catch* of the surveyed fishery" (emphases added)); *id.* § 1881(a)(e)(2)(C) (same).

[22] The Act contains numerous provisions that unmistakably refer to matters associated with the "traditional fishing of wild fish." *See, e.g., id.* § 1853(a)(1) (requiring FMP to be "applicable to foreign fishing and fishing by vessels of the United States"); *id.* § 1853(a)(2) (requiring FMP to "contain a description of the fishery, including . . . the number of vessels involved, the type and quantity of fishing gear used, . . . any recreational interests in the fishery, and the nature and extent of foreign fishing and Indian treaty fishing rights"); *id.* § 1853(a)(13) (requiring FMP to "include a description of the commercial, recreational, and charter fishing sectors which participate in the fishery").

[23] For similar reasons, we also disagree with the agency that the district court incorrectly limited the Act's scope to "wild fish." Again, the court used "wild fish" merely to contrast with "farmed fish," not to address the specific kinds of fish covered by the Act. No one contests that the Act defines "fish" broadly to embrace "all other forms of marine

No. 19-30006

The agency further argues that the district court's interpretation slights the term "harvesting," making it redundant with "catching" and "taking." This invokes the anti-surplusage canon, which encourages courts to give effect to "all of [a statute's] provisions, so that no part will be inoperative or superfluous, void or insignificant." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 294 (5th Cir. 2020) (en banc) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). But that canon "yields to context," *id.* (citation omitted), and we have explained that, in context, the three terms are synonymous. Sometimes Congress writes statutes this way, either due to a "not uncommon sort of lawyerly iteration," *id.* (quoting *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012)), or "out of an abundance of caution," *Fort Stewart Sch. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 646 (1990). And, even on the agency's reading, the term "harvesting" is no more superfluous than "catching" and "taking" are to each other. The bottom line: "If the meaning of a text is discernibly redundant, courts should not invent new meaning to avoid superfluity at all costs." *Latiolais*, 951 F.3d at 294. We decline the agency's invitation to do so here.[24]

---

animal and plant life other than marine mammals and birds." *Id.* § 1802(12). That definition, however, says nothing about whether the Act opens the door to aquaculture.

[24] The agency relies on *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, which applied the anti-surplusage canon to "take" in the Endangered Species Act ("ESA"). 515 U.S. 687, 690 (1995). The ESA penalizes "taking" an endangered species, defining "take" as "harass, harm, pursue, wound, or kill." *Id.* (cleaned up). The Secretary of the Interior defined "harm" to include modifying a habitat. *Id.* The Court upheld that reading, in part because it prevented "harm" from duplicating the other words in the definition of "take". *Id.* at 698. Similarly, it held the D.C. Circuit erred by using *noscitur a sociis* to deny "harm" any "independent meaning." *Id.* at 702. *Sweet Home* does not support the agency's position. As relevant here, *Sweet Home* rejected *noscitur a sociis* largely because "[t]he statutory context of 'harm' suggest[ed] that Congress meant that term to serve a particular function in the ESA, consistent with, but distinct from, the functions of the other verbs used to define 'take.'" *Id.* at 702. But here nothing suggests "harvesting" in 16 U.S.C. § 1802(16) was meant to carry any more water than "catching" or "taking."

No. 19-30006

The agency also relies on the breadth of some of the Act's terms to show an expansive meaning of "harvesting." For example, it cites § 1855(d), giving the agency "general responsibility to carry out any fishery management plan" and empowering it to "promulgate such regulations . . . as may be necessary to discharge such responsibility or to carry out any other provision of this chapter." It also cites language defining "fishery resources" to include "*any* fishery" and "*any* stock of fish." 16 U.S.C. § 1802(15) (emphases added). We are unpersuaded. These provisions are like "the broad grants of authority" DHS vainly relied on in *Texas*.[25] We refused to read such provisions to expand the agency's power beyond the statute's terms. So too here. The grant of authority to promulgate "necessary" regulations cannot expand the scope of the provisions the agency is tasked with "carry[ing] out." *Id.* § 1855(d). And the grant of authority over "any fishery" and "any stock of fish," *id.* § 1802(15), still depends on whether the relevant stock is a "fishery," which, in turn, turns on the definition of "fishing." As explained, nothing in the definition plausibly suggests the agency has been given authority to regulate aquaculture.

Finally, we point out a more fundamental problem with the agency's position. In 1976, when Magnuson-Stevens was passed, Congress knew what aquaculture was and how to confer authority to regulate it. Only four years earlier, Congress had amended the Federal Water Pollution Control Act of 1948 to give EPA authority to regulate "aquaculture project[s]." *An Act to Amend the Federal Water Pollution Control Act*, Pub. L. 92-500, § 318(a), 86 Stat. 816, 877 (1972), *codified at* 33 U.S.C. § 1328(a). Subsequently, in 1992

---

[25] *See* 809 F.3d at 183 (citing 6 U.S.C. § 202(5) (providing DHS "shall be responsible for . . . [e]stablishing national immigration enforcement policies and priorities"), and 8 U.S.C. § 1103(a)(3) (providing Secretary "shall establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter")).

and 2007, Congress even added three specific references in parts of Magnuson-Stevens to "aquaculture" and "fish farms."[26] As the district court concluded, while these "discrete and immaterial provisions" do not purport to empower NFMS to regulate aquaculture, they do show that Congress knows how to legislate on the subject when it wishes. *See, e.g., Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another, it is presumed that Congress acts intentionally and purposely." (cleaned up)).[27] In light of that, the agency's position appears all the more unfathomable. From one word—"harvesting"—the agency would conjure up authority over aquaculture that Congress knew how to give, but never gave. That does not hold water.

## 2.

So far, we have seen that the definition of "fishing" in § 1802(16), on its own terms, forecloses the agency's interpretation. That result is reinforced when we read the definition "in context and with reference to the

---

[26] In 1992, Congress provided resources "to restore overfished New England groundfish stocks through aquaculture or hatchery programs." Pub. L. No. 102-567, § 902(a), 106 Stat. 4270, 4318 (1992), *codified at* 16 U.S.C. § 1863(a)(E). In 2007, Congress established programs "to educate and inform consumers about the quality and sustainability of wild fish or fish products farmed through responsible aquaculture." Pub. L. No. 109-479, § 109, 120 Stat. 3575, 3595 (2007), *codified at* 16 U.S.C. §§ 1855(j)(1)–(2). The same amendment delineated the status of "an individual who owns or operates a fish farm outside of the United States." *Id.* § 103(j), 120 Stat. at 3583, *codified at* 16 U.S.C. § 1852(d)(2)(D)(iii).

[27] The agency's rejoinder is unpersuasive. It claims there is no evidence "that Congress actually considered the question of NMFS's regulating aquaculture" and rejected that possibility. *See Coastal Conservation Ass'n v. U.S. Dep't of Commerce*, 846 F.3d 99, 106 (5th Cir. 2017) (negative-implication canon does not apply "unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it"). But the 1972 Federal Water Pollution Control Act amendment is precisely such evidence.

larger statutory scheme." *Sw. Elec. Power Co.*, 920 F.3d at 1024 (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)).[28] As the district court pointed out, there are "various ways in which [the Act] is nonsensical when applied to aquaculture." That is correct. When aquaculture is viewed as a "fishery," some of the Act's core requirements stop making sense. We will not defer to an agency interpretation that is "inconsistent with the design and structure of the statute as a whole." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) (citation omitted).

The Rule's innovation is to equate an "aquaculture facility" with a "fishery" under the Act.[29] But the Act makes demands on a fishery that cannot apply to an aquaculture facility. Importantly, each fishery must have a plan (the "FMP") with measures designed "for the conservation and management of the fishery, [and] to *prevent overfishing* and rebuild *overfished stocks*." 16 U.S.C. § 1853(a)(1)(A) (emphases added). Easy to see how this applies to a typical fishery: the FMP must have measures, like annual catch limits, that will prevent taking too many fish out of the relevant fishery.[30] But try applying this idea to aquaculture, and your line will become hopelessly snarled. "Since aquaculture is essentially a farming operation," the Rule tells us, "all animals cultured are intended for harvest *and cannot undergo*

---

[28] *See also, e.g., United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 496 (5th Cir. 2014) (we interpret statutes by "looking at the full text of the statute, rather than one isolated clause, along with the statute's structure and its public safety purpose").

[29] *See, e.g.,* 81 Fed. Reg. at 1762 (Rule establishes a program for managing an "aquaculture facility" in the Gulf of Mexico); *id.* ("The aquaculture facility is managed under the FMP."); *id.* (Rule authorizes a "Gulf aquaculture permit" that "authorizes operation of an offshore aquaculture facility in the Gulf EEZ").

[30] *See, e.g.,* International Fisheries; Pacific Tuna Fisheries; 2019 and 2020 Commercial Fishing Restrictions for Pacific Bluefin Tuna in the Eastern Pacific Ocean, 84 Fed. Reg. 18,409 (May 1, 2019) (establishing annual catch limits on Pacific bluefin tuna), *codified at* 50 C.F.R. pt. 300.

*overfishing or become overfished*." 81 Fed. Reg. at 1771 (emphasis added).[31] Other provisions of the Act are also geared to prevent "overfishing" a fishery,[32] including one of the national standards every FMP must honor.[33] Equating a "fishery" with an aquaculture facility effectively erases these provisions from the Act.[34]

The agency responds that aquaculture may help mitigate overfishing with respect to "other stocks of fish"—that is, other fisheries. That is mistaken. The Act specifies when an FMP must address the specific fishery that is the subject of the plan. *See generally* 16 U.S.C. §§ 1853(a)(1)(A), (a)(2), (3), (5)–(7), (10), (11), (13)–(15) (applying FMP requirements to "the fishery" in question). As to overfishing, an FMP must "specify objective and measurable criteria for identifying when *the fishery to which the plan applies* is overfished," and must "establish a mechanism for specifying annual catch

---

[31] *See also* 81 Fed. Reg. at 1784 (stating "it is not possible to overharvest cultured animals").

[32] *See, e.g.,* 16 U.S.C. § 1853(a)(10) (plan must specify criteria "for identifying when the fishery to which the plan applies is *overfished*," and, "in the case of a fishery which the Council or the Secretary has determined is approaching an overfished condition or is overfished, contain *conservation* and management measures to prevent *overfishing* or end *overfishing* and rebuild the fishery"); *id.* § 1853(a)(15) (plan must have a "mechanism for specifying annual catch limits . . . at a level such that *overfishing* does not occur in the fishery" (emphases added)).

[33] *See id.* § 1851(a)(1) (requiring any FMP, "and any regulation promulgated to implement such plan," to be consistent with national standards including "[c]onservation and management measures [that] *shall prevent overfishing*" (emphasis added)).

[34] Same for the Act's requiring an FMP to assess a fishery's "maximum sustainable yield and optimum yield." *See* 16 U.S.C. §§ 1853(a)(3), 1851(a)(1). An aquaculture facility's "yield" is by definition 100% because—again, as the Rule itself states—"*all* animals cultured are intended for harvest." 81 Fed. Reg. at 1770 (emphasis added). So, it makes no sense to talk about the "maximum sustainable yield" or "optimum yield" from an aquaculture facility. *Cf.* 16 U.S.C. § 1802(33) (defining "optimum," in part, as referring to "an overfished industry").

limits . . . at a level such that overfishing does not occur *in the fishery*." *Id.* § 1853(a)(10), (15) (emphases added).[35] Here, the regulated fishery includes only aquaculture facilities, *see* 81 Fed. Reg. at 1762, and the overfishing requirements apply to *those* "fisheries," not others.[36]

The agency also invokes its general authority under the Act to "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. § 1853(b)(14). It claims regulating aquaculture is "necessary and appropriate" to conserve fishing resources, perhaps by diminishing demand on wild fisheries. But, as discussed already, the Act's pertinent conservation provisions apply *to each FMP* and *per fishery*. In other words, the Act requires each management plan to employ conservation techniques for the given fishery, not for all fisheries or the ecosystem as a whole. Accordingly, the Act defines "fishery" as "one or more stocks of fish *which can be treated as a unit for purposes of conservation and management*." *Id.* § 1802(13) (emphasis added). Here, the Rule conceives all Gulf aquaculture as one "fishery," 81 Fed. Reg. at 1762, such that the Act's

---

[35] When the Act requires an FMP to consider impacts on *other* fisheries, it says so. *See id.* § 1853(a)(9)(B) (plan must include an impact statement analyzing likely effects on, *inter alia*, "participants in the fisheries conducted in adjacent areas under the authority of another Council"). Such references to *other* fisheries do not appear in the Act's overfishing measures discussed above.

[36] The agency cites no textual basis showing that one fishery can be regulated to prevent overfishing in another fishery. It quotes only the definition of "conservation and management," which refers to measures for "rebuilding, restoring, or maintaining[] *any* fishery resource and the marine environment." *Id.* § 1802(5)(A) (emphasis added). But the word "any" merely confirms that conservation measures include all of the "fishery resources" in § 1802(15). In any event, the agency does not explain how one word in the definition of "conservation and management" overrides the Act's express requirements that overfishing measures apply to the specific regulated fishery. *See, e.g., id.* § 1802(a)(10) (referring to overfishing criteria applicable to "the fishery to which the plan applies").

required conservation techniques apply only to *that* "fishery," not all Gulf fishing or all fishing under the Act's ambit.

Finally, we note the agency itself has conceded the Act fits poorly with aquaculture. In the Rule's environmental impact statement, NMFS candidly stated that "[t]he [Act] was . . . not explicitly written for managing at sea fish farming or aquaculture operations." Accordingly, "[m]any of the principles and concepts that guide wild stock management under the [Act] are *either of little utility or not generally applicable* to the management of aquaculture operations" (emphasis added).[37] The agency thus admitted that "[m]any" of the Act's "legal requirements do not fit well or are difficult to satisfy with respect to aquaculture, thereby making them seem less useful or even unnecessary." "Despite this lack of conceptual similarity," the agency nonetheless insisted that "offshore aquaculture falls within the realm of activities subject to regulatory control under the [Act] and therefore must be accommodated within the existing legal framework." This was the district court's reaction, which we find apt:

> Contrary to the NMFS's position, this Court does not view the incompatibility of the requirements of the [Magnuson-Stevens Act] with aquaculture operations as an unfortunate happenstance, but rather, as a clear indication that Congress did not intend for the [Act] to grant NMFS the authority to regulate aquaculture.[38]

\*\*\*

---

[37] *Accord* 81 Fed. Reg. at 1762 ("[M]any of the principles and concepts that guide wild stock management are not generally applicable to the management of an aquaculture fishery.").

[38] Given our conclusion that the Act's text and structure foreclose the agency's interpretation, we need not reach the district court's conclusion that the Act's legislative history also fails to support the agency's position.

No. 19-30006

The judgment of the district court is AFFIRMED.

STEPHEN A. HIGGINSON, *Circuit Judge*, dissenting:

Through the Magnuson-Stevens Fishery Conservation and Management Act of 1976 (Magnuson Act) and its national standards, 16 U.S.C. §§ 1801–1882, Congress delegated to the Commerce Department expansive authority to regulate, manage, and conserve fish in the exclusive economic zone. Specifically, the Commerce Department's National Marine Fisheries Service (NMFS), in conjunction with eight independent regional fishery management councils, "will exercise . . . exclusive fishery management authority over *all fish*, and *all Continental Shelf fishery resources*, within the exclusive economic zone." § 1811(a) (emphasis added); *see also* §§ 1851, 1854–55; *see generally Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1008 (9th Cir. 2006); *Kramer v. Mosbacher*, 878 F.2d 134, 135 (4th Cir. 1989). Congress provided that this expansive authority should be used to "conserve and manage the fishery resources found off the coasts of the United States . . . by . . . exploring, exploiting, conserving, and managing *all fish*," "promote domestic commercial and recreational fishing under sound conservation and management principles," and "encourage the development by the United States fishing industry of fisheries which are currently underutilized or not utilized by United States fishermen." § 1801(b)(1), (3), (6) (emphasis added).

In turn, the Gulf of Mexico Fishery Management Council, comprised of members from the five Gulf states, eleven of whom are nominated by those states' governors, spent six years discussing offshore aquaculture before adopting the Plan for Regulating Offshore Marine Aquaculture in the Gulf of Mexico. That plan, which went into effect in 2009, regulates and permits greatly enhanced takes of fish through the operation of offshore structures

and nets wherein fish are bred and from which fish are harvested.[1] Thereafter, in 2014, NMFS published its Proposed Rule to implement the plan; and, in January 2016, its Final Rule. *See generally* 81 Fed Reg. 1762 (Jan. 13, 2016).

I would uphold NMFS's decision that it may regulate how fish are reared and harvested in the exclusive economic zone because this authority follows from Congress's expansive grant of authority to conserve and manage offshore "fishery resources," without distinguishing between methods of fishing or types of fish. *See* § 1802(15) (defining "fishery resource" as "*any* fishery, *any* stock of fish, *any* species of fish, and *any* habitat of fish" (emphasis added)).

As the majority notes, Congress's statutory delegation to NMFS does not delimit "aquaculture" as an industry distinct from other types of fishing. I would say that is because fishing, from time immemorial, has involved ingenious varieties of lines, pots, cages, nets and enclosures. The Magnuson Act responsibility given to NMFS—to conserve, maintain, and manage offshore fisheries—comprehends not just familiar mariculture methods like mussel lines and lobster traps, *see, e.g.*, *Duckworth v. United States ex rel. Locke*, 705 F. Supp. 2d 30, 45–46 (D.D.C. 2010), fish hatcheries, *see, e.g.*, *Gutierrez*, 452 F.3d at 1109, 1117–19, and towed mesh cages capable of growing up to 2,000 fish, *see Kahea v. NMFS*, 2012 WL 1537442, at *8–*10 (D. Haw. 2012), *affirmed in relevant part*, 544 F. App'x 675 (9th Cir. 2013), but also the more modern and enlarged methods contemplated by the Final Rule.

---

[1] The timing of the plan was not coincidental. The United States had become deeply reliant on imported seafood to meet demand. Kristen L. Johns, Note, *Farm Fishing Holes: Gaps in Federal Regulation of Offshore Aquaculture*, 86 S. CAL. L. REV. 681, 683 (2013) (observing that, in 2011, the United States imported 91% of its seafood supply).

Regardless, even if the Magnuson Act's capacious regulatory grant does not unequivocally comprehend aquaculture, I would say it is at least ambiguous.[2]  Indeed, to read out ambiguity, I would have to say either, as appellees do, that fish farming is not "fishing," or, as the district court did, that "fishing" only means what it meant "traditionally" when the Magnuson Act was passed in 1976, assertedly the capture of "wild" fish. *But cf. Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1745 (2020) ("[C]ontentions about what . . . the law was meant to do, or should do, [do not] allow us to ignore the law as it is.").

Each of these understandings is plausible but neither is an unambiguously correct interpretation of the statutory language. That is because Congress provided an expansive definition of "fishing," explicitly including "*any operations at sea* in support of*" "*any other activity* which can reasonably be expected to result in the *catching, taking, or harvesting of fish*." § 1802(16) (emphasis added).[3]  Spawning, raising, and then taking or

---

[2] The majority classifies NMFS's position as "nothing-equals-something." But I understand NMFS to be relying on the broad language in the statute and the broad purposes of the statute to argue—I think convincingly—that it is at least ambiguous whether the plain language of the statute encompasses aquaculture. *See Envtl. Integrity Project v. EPA*, 960 F.3d 236, 246–47 (5th Cir. 2020) ("Under *Chevron*, we defer to an agency's interpretation when it reasonably resolves a genuine statutory ambiguity."). NMFS argues separately against what *it* perceives to be "nothing-equals-something" analysis where courts insert limiters like "wild" or "traditional" onto Congress's "any/all" statutory grant.

[3] The majority applies the noscitur a sociis canon of statutory interpretation to conclude that "harvesting" is "synonymous with" "catching" and "taking." In applying the noscitur a sociis canon, courts should focus on the "most general quality—the least common denominator, so to speak—relevant to the context." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 196 (2012). As I read the statute, the least common denominator is extraction of "any fish" from the water. Both "harvest" and "take" could be used to describe aquaculture, where fish are raised in offshore enclosures

harvesting fish from offshore nets, pens, or other enclosures are "operations at sea" supporting "any . . . activity" that results in the taking or harvesting of fish. *See id.*

In fact, ambiguity enters only when one considers the majority's points that other provisions of the Act, separate and distinct from NMFS's authorizing text, may be inapt when applied to modern methods of rearing and harvesting fish in and from enclosed offshore waters. These points are well taken,[4] but do not unambiguously resolve the issue. *See City of Dallas v. F.C.C.*, 118 F.3d 393, 395 (5th Cir. 1997) (holding that a court must "defer to the agency's reasonable construction" of a statute if there is ambiguity after applying all of the traditional tools of interpretation, including analysis of the "design of the statute as a whole").

Therefore, applying *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), I would defer to the agency's reasonable interpretation. *Envtl. Integrity Project v. EPA*, 960 F.3d 236, 246–47 (5th Cir. 2020). Interpreting the Magnuson Act to permit regulation of aquaculture is reasonable. Aquaculture fits within the Act's broad definitions of "fishery resources" and "fishing," and regulating aquaculture fits within the Act's mandate to manage and conserve "all fish, and . . . fishery resources, within the exclusive economic zone." §§ 1802(15)–(16), 1811(a).

\*\*\*

---

and then "harvested" or "taken" from those enclosures, so the noscitur a sociis canon—in my view—does not limit the appropriate interpretation of "harvest" to wild fish.

[4] *See* Read Porter & Rebecca Kihslinger, *Federal Environmental Permitting of Offshore Aquaculture: Coverage and Challenges*, 45 ENVTL. L. REP. NEWS & ANALYSIS 10875, 10881 (2015).

No. 19-30006

Congress's clear purpose to conserve and maintain our nation's offshore fisheries, coupled with its explicit and capacious grant of authority over "all fish," lead me to conclude that modern aquaculture methods of fishing fit vitally in, not out of, the Magnuson Act regime.[5] Alternatively, I would find that the statutory grant of authority is at least open on that point, obliging us to defer to the NMFS's reasonable interpretation before invalidating over a decade of state and federal officials' efforts, along with private experts, to draft a "fishery management" plan that reconciles myriad commercial, environmental, and recreational interests.[6]

---

[5] Multiple other federal agencies regulate aquaculture, including the Army Corps of Engineers, the Environmental Protection Agency, the U.S. Fish and Wildlife Service, and the Department of Agriculture. Scholars have noted, however, that "the [Magnuson Act] is an important link in protecting the environment from the impacts of offshore aquaculture because it authorizes NMFS to deploy management measure and permit conditions . . . that are not adequately addressed by other regulatory programs." Porter & Kihslinger, *supra* note 4, at 10882.

[6] Notably, these interests include conservation and management of wild fish, which no one disputes as a fundamental purpose of the Magnuson Act. *See* Porter & Kihslinger, *supra* note 4, at 10882, 10892–93. It would be puzzling if the broad authority to manage and conserve wild fish under the Magnuson Act in no way permitted regulation of fish reared in, harvested from, and impacting the same waters.